UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ALICIA STREET, et al., | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.  4:19-cv-2590 CDP |
| | ) | |
| LT.COL. LAWRENCE O'TOOLE, et al., | ) | |
| | ) | |
|     Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OF DEFENDANTS BAIN et al. ("LINE OFFICERS")**

To describe plaintiffs' amended complaint [ECF 13] as a shotgun complaint rather understates its character.  In the cosmos of pleading it is more analogous to what the plaintiffs claim the defendants in this case did, i.e., indiscriminately pepper spray wrongly arrested protesters, except that where officers allegedly used pepper spray, the plaintiffs have used indiscriminate allegations and insulting agitprop (e.g., amended complaint ¶¶264, 275).  Thirty-seven police officers were injured in the line of duty during September 2017 in the City of St. Louis policing "peaceful protests," several still have not been able to return to duty.  Is it asking too much to expect that plaintiffs adhere to F.R.Civ.P. 8(a) and 11 in bringing their claims?  Apparently it is.

Plaintiffs exhibit a peculiar inversion of principles of due process, apparently believing that the burden of proof is on police officer defendants to *disprove* allegations of constitutional violations in making arrests or using force.  Plaintiffs also apparently believe that the City has an obligation to furnish them with police reports that are satisfactory to them, and so it's the City's fault that they can't figure out whom to sue.  This after over two years of litigation in the many

suits that they are only too happy to mention in their amended complaint, including access to the voluminous record and discovery in the parallel class action of *Ahmad v. City of St. Louis,* 4:17-cv-2455.  To be sure, the plaintiffs dropped a number of individual defendants after the City represented that they were not on duty or could not otherwise have participated in the events of September 17, 2017; but, unaccountably, plaintiffs then decided to add another 42 officers as defendants, leaving the case even more muddled than before.

Defendants are aware of the Court's distaste for strident rhetoric, but they believe that this remonstrance is warranted by plaintiffs' irresponsible manner of instituting this action, heedless of harm to defendant line officers' credit ratings, mortgage closings, and, potentially, peace officer licensure.   Plaintiffs' amended complaint exhibits the utmost contempt for hundreds of police officers who had no physical contact with any plaintiff or putative class member and only did their duty.  This Court should reprove plaintiffs' tactics by dismissing the amended complaint against all named line officers in the absence of plausible allegations of direct personal involvement in a constitutional violation.  In this case, dismissal should also include an award of fees and costs.

Plaintiffs named hundreds of police officers in paragraph 10 of the amended complaint.  Some are described as detectives, but none are alleged to have had supervisory authority and so are referred to as "line officers."  This memorandum will attempt to focus on the issues that are most relevant to the defendant line officers' motion to dismiss and will try to avoid duplicating arguments advanced in parallel motions to dismiss by the City, its executive officers, and police supervisors.

Allegations

The truly material facts alleged by plaintiffs are not in dispute: plaintiffs were arrested in the City of St. Louis on September 17, 2017, at the direction of defendants Lt.Col. Leyshock and Lt. Sachs; in the course of the arrests, some officers deployed pepper spray at some class plaintiffs; all arrestees were handcuffed; all arrestees were taken to the City Justice Center for processing; all arrestees were released within 24 hours; no charges were ever filed against any arrestee as a result of the mass arrest during the night of September 17. Amended complaint ¶¶72, 115-16; Ex. D, *passim.*

The amended complaint, including its exhibits, also reveals that, in the time leading up to the mass arrest on September 17, there was a protest march and demonstration near police headquarters west of the main downtown area. ¶140-143. Afterward, a large crowd of protesters broke off from the daytime peaceful demonstration and marched into the main downtown area after dark. This group vandalized property and assaulted police officers. ¶44; Ex. D, pp. 147-48; Ex. E, pp. 197-98. Although the group appeared to disintegrate, allowing police "civil disobedience teams (CDT's)" to withdraw, it appeared that the group re-formed and began again to display aggressive and assaultive behavior. Ex. E, pp. 10-11, 187-88. 192-93. As a result, the incident commander, Lt.Col. Leyshock, and the CDT commander Lt. Sachs, considered it necessary to effect a mass arrest of all persons who refused to disperse from the vicinity of Tucker Blvd. and Washington Ave. ¶¶55; Ex. E, pp. 70-71, 198-99. The CDTs were recalled and ordered to form lines to encircle the crowd preparatory to arrests. After repeated dispersal orders produced no effect, the CDTs were ordered to move in and arrest everyone still milling about the intersection of Tucker and Washington. Ex. D, pp. 60-61; Ex. E, pp. 71-72, At the time, there was a large crowd at that intersection, many wearing masks and goggles as had

3

protesters on previous nights when violence and vandalism occurred.  ¶¶87-88; Ex. D, pp. 157-58.

CDT officers are police officers who are specially trained and equipped to police civil disorder situations.  They wear standard protective equipment, including helmets and face shields.  For present purposes, it is reasonable to infer that all or almost all of the defendant line officers were CDT officers.  These officers had been subjected to assaultive behavior during mass protests in the City beginning on September 15, 2017.  They were deployed to control a virtual riot at the Mayor's home on the night of September 15.  They were again deployed to assist St. Louis County and University City police when vandalism and assaults occurred after dark on September 16.  Over 30 officers were injured during the weekend of September 15-17.

Argument

**1.     The conspiracy claims against defendant line officers must be dismissed on the basis of qualified and, as far as the state conspiracy claim is concerned, on the basis of the intracorporate liability doctrine and official immunity.**

Defendants O'Toole and Deeken and the supervisory officers named in paragraph 9 of the amended complaint have raised the issue of the intracorporate conspiracy doctrine, and defendant line officers will not further elaborate on their arguments, but they do not waive the argument and join in the parallel motions to dismiss on that issue.  However, co-defendants have also asserted qualified immunity to plaintiffs' conspiracy claims.  The argument for qualified immunity is still stronger in the case of defendant line officers. Although plaintiffs allege in conclusory terms a "plan" or "agreement" to intimidate, illegally arrest and physically mistreat protesters by all defendants, it is plain from the factual allegations that the mass arrest was an *ad hoc* decision, and that no reasonable line officer would know that obeying the orders of the

incident commander to encircle and arrest plaintiffs amounted to an actionable conspiracy. In addition, reasonable officers could not have known that a decision by some fellow officers to deploy pepper spray or otherwise mistreat an arrestee could involve all officers in an actionable conspiracy.

Defendant line officers were all employees of the City at the time of plaintiffs' arrests. Their actions in encircling and arresting plaintiffs were determined not by them but by their superiors. There is no specific allegation that any one of defendant line officers deployed pepper spray, handcuffed, or struck any plaintiff. The theory is that any and all officers could be liable for any constitutional violation in the course of the incident because of the conspiracy. To countenance such a theory would make policing of mass civil disorders or any other crowd control policing a virtual impossibility.

There is no precedent in this Circuit for holding officers liable for a conspiracy by acting on information or direction from other officers in a mass arrest situation. Certainly officers are entitled reasonably to rely on information from other officers. Even if the information turns out to be inaccurate, that does not mean that the officer acted unreasonably. Regardless, to concoct an actionable "conspiracy" out of obedience to superior orders in the field is not supported by any precedent and so defendant line officers cannot be held to have known that the violative nature of their conduct was clearly established. *Ashcroft v. al-Kidd,* 563 U.S. 731, 742 (2011). Likewise, the line officers could not have known in September 2017 that they could be liable for a conspiracy to use excessive force or deny medical care on the basis of actions of officers employed by the same agency. The very fact that the law of intracorporate conspiracy is unsettled compels the grant of qualified immunity to defendant line officers. Compare *Ziglar v. Abbasi,* 137 S.Ct. 1843 (2017) with *Ashcroft v. Iqbal,* 556 U.S. 662 (2009).

5

As to the state law conspiracy claim (count XIV), Missouri law unequivocally follows the intracorporate conspiracy doctrine.  E.g., *John Deere Co. v. Short,* 378 S.W.2d 496 (Mo. 1964); *Hedrick v. Jay Wolfe Imports I, LLC,* 404 S.W.3d 454 (Mo.App.W.D. 2013).  In addition, officers making arrests and deploying force in connection with arrests are entitled under state law to official immunity.  *State ex rel. Alsup v. Kanatzar,* 588 S.W.3d 187 (Mo.banc 2019); *Southers v. City of Farmington,* 263 S.W.3d 603 (Mo.banc 2008).  The state law conspiracy claim against defendant line officers must be dismissed.

**2.     In the alternative, all claims against defendant line officers, in the absence of allegations of direct personal involvement in an arrest or use of force, must be dismissed on the basis of qualified and official immunity, because their participation in the mass arrest was not a violation of clearly established constitutional rights of plaintiffs.**

Police officers in making arrests and applying force are entitled to qualified immunity if their actions, under the totality of the circumstances judged from the standpoint of the individual officers, were reasonable or "reasonably unreasonable."  Arrests are reasonable if the officers have at least arguable probable cause.  Similarly, the use of force is reasonable if the force used was arguably reasonable under the circumstances.  Quite simply, if the actions of the officers are actions that a reasonable officer could have believed lawful, qualified immunity prevails.  See *Anderson v. Creighton,* 483 U.S. 635 (1987); *Kelsay v. Ernst,* 933 F.3d 975 (8th Cir. 2019)(*en banc*); see also *Rudley v. Little Rock P.D.,* 935 F.3d 651 (8th Cir. 2019).

In the case at bar, reasonable officers engaging as a unit in a mass arrest could reasonably believe that the arrests were lawful and that any use of force in that connection was reasonably necessary to gain compliance by arrestees or to control a potentially chaotic situation.  The most pertinent precedents in this Circuit are *White v. Jackson,* 865 F.3d 1064 (8th Cir. 2017), and

*Bernini v. City of St. Paul,* 665 F.3d 997 (8th Cir. 2012).  Both of those cases involved police action in response to mass protests.  While the precise circumstances may be dissimilar, both cases recognize the inherent difficulties of policing mass protests and the truism that "What is reasonable in the context of a potential large-scale urban riot may be different from what is reasonable in the relative calm of a tavern with a dozen patrons."  *Bernini*, 665 F.3d at 1003.  Those cases also recognize that a theory of failure to intervene requires pleading and proof of facts, not conclusions, leading to a belief that an officer knew of a constitutional violation in sufficient time to prevent it--under the circumstances then existing.  *Robinson v. Payton,* 791 F.3d 824 (8th Cir. 2015).

      Plaintiffs' effort to paint defendant line officers as participants in an organized, premeditated conspiracy to deny constitutional rights by false arrest and excessive force does not pass muster under *Ashcroft v. Iqbal*.  Liability of officers on any theory, including failure to intervene, requires a more plausible pleading than proffered by plaintiffs.  The allegations of the amended complaint, if tolerated by this Court, will open the door to transforming qualified immunity into a rule of pleading--something emphatically rejected by the Supreme Court.  *Anderson v. Creighton,* 483 U.S. at 639.

      **3.    All state law claims against defendant line officers should be dismissed and could be dismissed under 28 U.S.C. §1367(c).**

      The deficiencies of plaintiffs' pleading of their state law claims is discussed in companion motions to dismiss by other defendants herein.  Defendant line officers will observe only that plaintiffs have not and cannot allege any personal participation by all defendant line officers in any of the state law torts claimed.  In addition, defendant line officers are shielded by official immunity and by the state law application of the intracorporate immunity doctrine.

In any event, if the federal claims against defendant line officers are dismissed, this Court may choose to dismiss the state law claims without prejudice, leaving plaintiffs to seek relief in the state courts. 28 U.S.C. §1367(c). Defendants submit that refusing to exercise supplementary jurisdiction over those claims would be well within the Court's discretion.

## Conclusion

Defendant line officers submit that counts I-V and XV (§1983 claims) should be dismissed with prejudice at plaintiffs' cost, including reasonable attorney's fees. Counts VII-XIV (state law claims) should be dismissed either with prejudice, or without prejudice pursuant to 28 U.S.C. §1367(c).

Respectfully submitted,

JULIAN L. BUSH
CITY COUNSELOR

/s/Robert H. Dierker 23671(MO)
Associate City Counselor
dierkerr@stlouis-mo.gov
Brandon Laird 65564(MO)
Associate City Counselor
Abby Duncan 67766(MO)
Associate City Counselor
Megan Bruyns 69987(MO)
Assistant City Counselor
Amy Raimondo 71291(MO)
Assistant City Counselor
1200 Market St.
City Hall, Rm 314
St. Louis, MO 63103
314-622-3361
Fax 314-622-4956