**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

ALICIA STREET, RONALD HARRIS,   )
FUDAIL MCCAIN, ASHLEY THEIS, and  )
NICOLE WARRINGTON, on behalf of themselves )
and a class of similarly situated persons,   )
             )
  Plaintiffs,       )
             )
  v.          )  Cause No. 4:19-cv-02590
             )
LT. COL. LAWRENCE O'TOOLE, LT. COL. )  Jury Trial Demanded
GERALD LEYSHOCK, LT. TIMOTHY SACHS, )
MJR. DANIEL HOWARD, SGT. RANDY  )
JEMERSON, SGT. BRIAN ROSSOMANNO, )
SGT. SCOTT BOYHER, SGT. MATTHEW  )
KARNOWSKI, LT. BILL KIPHART,   )
SGT. SCOTT AUBUCHON, LT. KIMBERLY )
ALLEN, OFF. JERMAINE BANKS,   )
OFF. MARCUS BIGGINS, OFF. TIMOTHY )
BOCKSKOPF, OFF. MATTHEW BOESTER, )
DET. JASON BRANDHORST, DET.   )
MATTHEW BURLE, OFF. KEITH BURTON, )
DET. BRETT CARLSON, OFF. BENJAMIN )
CEHIC, DET. DANIEL CHAMBLIN, OFF. PAUL )
CHESTER, OFF. DANIEL CLAUSS, OFF. )
 KEVIN DANG, OFF. JEREMY DAVIS, )
DET. JESSE DYSON, DET. RICHARD  )
EDWARDS, OFF. MATTHEW EERNISSE, )
OFF. STEVEN FANZ, OFF. STEVEN FISCHER, )
OFF. GLENNON FRIGIERO , OFF. AARON )
GADDIS, OFF. JAZMON GARRETT,  )
OFF. JAMES HARRIS, OFF. ERIN  HEIN, )
DET. GEORGE HENRY, OFF. ERIC HENRY, )
OFF. MICHAEL HINES, OFF. REGINALD )
JONES, OFF. JEREMIAH KOERPER,  )
OFF. FRANCIS KOZIACKI, OFF. TRENTON )
LEE, OFF. TOM LONG, OFF. JOSEPH  )
MARCANTANO, OFF. JOSHUA MARTIN, )
OFF. LUKE MCDONNELL, OFF.   )
CHRISTOPHER MYERS, SGT. KENNETH )
NIZICK, OFF. AUSTIN PATTON,   )

OFF. KEITH PAULITSCH,  OFF. OLIVER      )
POGGIOLI, OFF. SAMUEL RACHAS,            )
OFF. STEPHANIE ROGERS, OFF. TERRENCE     )
RUFFIN, OFF. TREVOR RUSSELL,             )
OFF. GREGORY SCHAFFER, OFF. JONATHAN )
SENF, OFF. KORI SIMON, OFF. ELIJAH       )
SIMPSON, DET. THOMAS STRODE,             )
OFF. WILLIAM TRIPLETTE, OFF. CHAD        )
TULLOCK, SGT. SCOTT VALENTINE,           )
OFF. CHARLES WALL, OFF. RAMELLE          )
WALLACE, OFF. MARTINOUS WALLS,           )
DET. STEPHEN WALSH, OFF. JEANINE         )
WATERS, OFF. ANDREW WISMAR,              )
DET. BRANDON WYMS, OFF. SAMUEL           )
ZOUGLAS, OFF. JOSEPH BUSSO, OFF.         )
LANCE COATS, OFF. PATRICK DAUT,          )
SGT. BRANDT FLOWERS, SGT. SAMUEL         )
GILMAN, OFF. NICHOLAS LEE,               )
OFF. TRENTON LEE, OFF. BRIAN LEMONS,     )
OFF. TIMOTHY MCNAMARA, OFF. JAMIE        )
PARTEE, OFF. JOSEPH RODRIGUEZ,
OFF. JARRED THACKER                      )
                                         )
        Defendants.                      )

## THIRD AMENDED CLASS ACTION COMPLAINT

On September 17, 2017, officers from the St. Louis Metropolitan Police Department ("SLMPD") illegally seized and subjected Plaintiffs Alicia Street, Ronald Harris, Fudail McCain, Ashley Theis, and Nicole Warrington (collectively "Named Plaintiffs"), and 118 other individuals (collectively "putative class" or "Class") (the Named Plaintiffs and the putative class are collectively "Plaintiffs") to violence without probable cause and in contravention of the U.S. Constitution and Missouri law. Defendant Officers either directly violated the Named Plaintiffs and the putative class's civil rights or conspired to

2

do the same. Defendant Officers[1] unlawfully seized, battered, arrested, prosecuted, and inflicted emotional distress and physical harm on the Named Plaintiffs and the putative class and/or conspired to do the same.

The acts were planned, implemented, and directed by the Saint Louis Metropolitan Police Department, the acting Chief of Police, Defendants Leyshock, Howard, Boyher, Karnowski, Sachs, Rossomanno, Jemerson, Kiphart, Aubuchon - acting as supervisors. Before the protests on the night in question, Defendants made plans to terrorize protesters. The plan was not designed to keep the peace, to serve the common good, or to protect citizens.  It was designed to deter free speech and assembly. It was motivated by anger at the protesters and their message. It was, from the time it was conceived, and each time it was ratified during the events and after, a violation of clearly established constitutional law, including the First and Fourth Amendment.

It is unquestionable that all Defendants Officers acted in concert to deprive Plaintiffs of their constitutional rights and to inflict terror on each and every one of them, as described below.  It is equally clear that the kettling required planning and approval by the Saint Louis Metropolitan Police Department, including the acting Chief of Police. The events were a concerted, ratified plan that was not even arguably carried out within the bounds of state law or constitutional law.

## JURISDICTION AND VENUE

1.      Plaintiff brings this claim pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and the First and Fourth Amendments, as incorporated as against States and their municipal divisions through the Fourteenth Amendment.

---

[1] The term "Defendant Officers" means those officers identified in Paragraphs 7-18, below. The term "Supervisor Officers" means those officers identified in Paragraphs 7-16. The term "Arresting Officers" means those officers identified in Paragraph 17. The term "Abusive Officers" means those officers identified in Paragraph 18.

2.      The jurisdiction of this Court is proper, pursuant to 28 U.S.C. § 1331, because Plaintiff's action arises under the Constitution of the United States and § 1343(a)(3) to redress the deprivation of rights secured by the Constitution of the United States.

3.      Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the City of St. Louis.

4.      Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in the City of St. Louis and Defendants reside in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

5.      This Court has supplemental jurisdiction over the included Missouri state law claims, pursuant to 28 U.S.C. §1367.

6.      Plaintiff demands a trial by jury, pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

7.      Defendant Lawrence O'Toole was employed as a Lt. Colonel with the SLMPD during the events of September 17, 2017, as detailed in this Complaint. On that date, he was the acting Chief of Police and was responsible for all management and direction of the SLMPD. Defendant O'Toole knew or should have known that there was no probable cause for the arrest of Plaintiffs and that there was no legal justification to use force against Plaintiffs. Defendant O'Toole is sued in his individual capacity.

8.      Gerald Leyshock was employed as a police officer with the SLMPD. Defendant Leyshock has the rank of lieutenant colonel. Defendant Leyshock was the incident commander during the events of September 17, 2017. Defendant Leyshock knew or should have known that there was no probable cause for the arrest of the Class and that there was no legal justification to use force against the Class. Defendant Leyshock is sued in his individual capacity.

9.      Timothy Sachs was employed as a police officer with the SLMPD. Defendant Sachs had the rank of lieutenant. Defendant Sachs was on the ground supervising SLMPD officers during the events of September 17, 2017. He ordered the use of chemical agents and brought SLMPD's Civil Disobedience Team to the scene of the mass arrest. Defendant Sachs knew or should have known that there was no probable cause for the arrest of the Class and that there was no legal justification to use force against the Class. Defendant Sachs is sued in his individual capacity.

10.     Daniel Howard is employed as a police officer with the SLMPD. Defendant Howard has the rank of major. On the night of the incident, he was commander of the South Patrol. Howard was on the ground supervising SLMPD officers during the events of September 17, 2017. Defendant Howard also assisted Leyshock with planning the kettling event. Defendant Howard knew or should have known that there was no probable cause for the arrest of the Class and that there was no legal justification to use force against the Class. Defendant Howard is sued in his individual capacity.

11.     Randy Jemerson is employed as a police officer with the SLMPD. Defendant Jemerson has the rank of sergeant. He is a supervisor with the SLMPD's Civil Disobedience Team, a team tasked with handling protests and incidents of civil unrest. Defendant Jemerson was on the ground supervising SLMPD officers during the events of September 17, 2017. Defendant Jemerson knew or should have known that there was no probable cause for the arrest of the Class and that there was no legal justification to use force against the Class. Defendant Jemerson is sued in his individual capacity.

12.     Brian Rossomanno was employed as a police officer with the SLMPD. Defendant Rossomanno had the rank of sergeant. He was a supervisor with the SLMPD's Civil Disobedience Team, a team tasked with handling protests and incidents of civil unrest. Defendant Rossomanno was on the ground supervising SLMPD officers during the events of September 17, 2017. Defendant Rossomanno knew or should have known that there was no probable cause for the arrest of the Class and that there was

no legal justification to use force against the Class. Defendant Rossomanno is sued in his individual capacity.

13.     Scott Boyher is employed as a police officer with the SLMPD. Defendant Boyher has the rank of lieutenant. He was a supervisor with the SLMPD's Bike Response Team, the team that refused to allow the Class to leave the kettle and that initiated violence against the Class. Defendant Boyher was on the ground supervising SLMPD officers during the events of September 17, 2017. Defendant Boyher knew or should have known that there was no probable cause for the arrest of the Class and that there was no legal justification to use force against the Class. Defendant Boyher is sued in his individual capacity.

14.     Matthew Karnowski is employed as a police officer with the SLMPD. Defendant Karnowski has the rank of sergeant. He was a supervisor with the SLMPD's Bike Response Team, the team that refused to allow the Class to leave the kettle and that initiated violence against the Class. Defendant Karnowski was on the ground supervising SLMPD officers during the events of September 17, 2017. Defendant Karnowski was the first officer to broadly pepper spray civilians within the kettle causing terror and pain to the Class. Defendant Karnowski knew or should have known that there was no probable cause for the arrest of the Class and that there was no legal justification to use force against the Class. Defendant Karnowski is sued in his individual capacity.

15.     Bill Kiphart is employed as a police officer with the SLMPD. Defendant Kiphart has the rank of sergeant. Defendant Kiphart was on the ground supervising SLMPD officers during the events of September 17, 2017. Defendant Kiphart indiscriminately pepper sprayed civilians within the kettle causing terror and pain to the Class. Defendant Kiphart knew or should have known that there was no probable cause for the arrest of the Class and that there was no legal justification to use force against the Class. Defendant Kiphart is sued in his individual capacity.

16.     Scott Aubuchon is employed as a police officer with the SLMPD. Defendant Kiphart has the rank of sergeant. Defendant Aubuchon was on the ground supervising SLMPD officers during the events of September 17, 2017. Defendant Aubuchon indiscriminately pepper sprayed civilians within the kettle causing terror and pain to the Class. Defendant Aubuchon knew or should have known that there was no probable cause for the arrest of the Class and that there was no legal justification to use force against the Class. Defendant Aubuchon is sued in his individual capacity.

17.     Lt. Kimberly Allen, Off. Jermaine Banks, Off. Marcus Biggins, Off. Timothy Bockskopf, Off. Matthew Boester, Det. Jason Brandhorst, Det. Matthew Burle, Off. Keith Burton, Det. Brett Carlson, Off. Benjamin Cehic, Det. Daniel Chamblin, Off. Paul Chester, Off. Daniel Clauss, Off. Kevin Dang, Off. Jeremy Davis, Det. Jesse Dyson, Det. Richard Edwards, Off. Matthew Eernisse, Off. Steven Fanz, Off. Steven Fischer, Off. Glennon Frigiero, Off. Aaron Gaddis, Off. Jazmon Garrett, Off. James Harris, Off. Erin Hein, Det. George Henry, Off. Eric Henry, Off. Michael Hines, Off. Reginald Jones, Off. Jeremiah Koerper, Off. Francis Koziacki, Off. Trenton Lee, Off. Tom Long, Off. Joseph Marcantano, Off. Joshua Martin, Off. Luke McDonnell, Off. Christopher Myers, Sgt. Kenneth Nizick, Off. Austin Patton, Off. Keith Paulitsch, Off. Oliver Poggioli, Off. Samuel Rachas, Off. Stephanie Rogers, Off. Terrence Ruffin, Off. Trevor Russell, Off. Gregory Schaffer, Off. Jonathan Senf, Off. Kori Simon, Off. Elijah Simpson, Det. Thomas Strode, Off. William Triplette, Off. Chad Tullock, Sgt. Scott Valentine, Off. Charles Wall, Off. Ramelle Wallace, Off. Martinous Walls, Det. Stephen Walsh, Off. Jeanine Waters, Off. Andrew Wismar, Det. Brandon Wyms, Off. Samuel Zouglas were employed as officers with the SLMPD during the events of September 17, 2017, as detailed in this Complaint. Each of these officers (collectively referred to as "Arresting Officers") seized and arrested a member of the Class during the events of September 17, 2017. These Arresting Officers knew or should have known that there was no probable cause for the arrest of Plaintiffs and class members and that there was no legal justification to use force

against the Class. These Arresting Officers initiated proceedings against Plaintiffs and the Class. These Defendants are sued in their individual capacities.

18.     Off. Joseph Busso, Off. Lance Coats, Off. Patrick Daut, Sgt. Brandt Flowers, Sgt. Samuel Gilman, Off. Nicholas Lee, Off. Trenton Lee, Off. Brian Lemons, Off. Timothy McNamara, Off. Jamie Partee, Off. Joseph Rodriguez, Off. Jarred Thacker were employed as officers with the SLMPD during the events of September 17, 2017, as detailed in this Complaint. Each of these officers (collectively referred to as "Abusive Officers") used excessive force against a member of the Class during the events of September 17, 2017. The violence perpetrated by these Defendants caused terror and injury to the Class. These Defendants knew or should have known that there was no legal justification to use force against any member of the Class. These Defendants are sued in their individual capacities.

19.     Defendant the City of St. Louis, Missouri (hereinafter, "City of St. Louis") is a first-class city, and a political subdivision of the State of Missouri duly organized under the Constitution of Missouri.

20.     SLMPD is an instrumentality of the City of St. Louis, Missouri organized and controlled pursuant to the Statutes of the State of Missouri.

21.     The Public Facilities Protection Corporation of the City of St. Louis insures the SLMPD.

22.     Plaintiff Alicia Street is a resident of St. Louis County.

23.     Plaintiff Ronald Harris is a resident of St. Louis County.

24.     Plaintiff Fudail McCain is a resident of the City of St. Louis.

25.     Plaintiff Ashley Theis is a resident of St. Charles County.

26.     Plaintiff Nicole Warrington is a resident of the City of St. Louis.

## FACTS
### A.     Protests Begin After *Stockley* Verdict

27.     On Friday, September 15, 2017, after a four-day bench trial, a Missouri circuit court judge acquitted Officer Jason Stockley of the first-degree murder of Anthony Lamar Smith.

28.     Following the announcement of the Stockley Verdict, public protests began at multiple locations in St. Louis and surrounding communities.

29.     To many in the St. Louis community, Officer Stockley's acquittal was yet another example of white St. Louis-area police officers killing African-American citizens with impunity.

30.     Further, in the view of the protestors, the acquittal further supported their view that the American criminal justice system does not believe that Black lives matter.

31.     In response to the protests, St. Louis Metropolitan police officers amassed at several protests wearing military-like tactical dress, helmets, batons, and full-body riot shields and carrying chemicals, such as tear gas, skunk, inert smoke, pepper gas, pepper pellets, xylyl bromide, and/or similar substances (collectively, "chemical agents").

32.     This is in stark contrast to SLMPD's appearance at a multitude of other unpermitted protests where the police themselves are not the target of the protest, including an anti-Donald Trump march on November 13, 2016, the St. Louis Women's March on January 21, 2017, the St. Louis LQBTQIA March and Rally on February 22, 2017, and the St. Louis March for  Science on April 22, 2017.

33.     Virtually all of the protests relating to *Stockley* were non-violent.

34.     During the Stockley protests, SLMPD police officers *without warning* deployed chemical agents against individuals observing, recording, or participating in protest activity, including but not limited to the following:

      a.      The afternoon of Friday, September 15, 2017, near the intersection of Clark and Tucker Avenues.

      b.      The evening of Friday, September 15, 2017, near the intersection of McPherson and Euclid Avenues.

      c.      The evening of Friday, September 15, 2017, near the intersection of Waterman and Kingshighway Boulevards.

      d.      The evening of Friday, September 15, 2017, near the intersection of Lindell and Euclid Avenues.

      e.      The evening of Friday, September 15, 2017, near the intersection of Euclid and Maryland Avenues.

      f.      The evening of Friday, September 15, 2017, near the intersection of Lindell and Kingshighway Boulevards.

      g.      The evening of Friday, September 15, 2017, near the intersection of Euclid Avenue and Pershing Place.

      h.      The evening of Friday, September 15, 2017, on Hortense Place.

      i.      The evening of Sunday, September 17, 2017, near the intersection of Tucker Boulevard and Washington Avenue.

      j.      The evening of September 29, 2017 outside of Busch Stadium.

35.      These incidents are consistent with the pattern and practice of SLMPD of indiscriminately using chemical agents and force without warning or any arguable belief of legal justification in an effort to deter free speech and assembly, when that speech opposes behavior by the police.

36.      The purpose of the police response to the *Stockley* protests, including the events at issue in this complaint, was to terrorize citizens in order to deter messages the Saint Louis Metropolitan Police Department opposed.

37.      Moreover, as is evident in the indictment filed in federal court by the US Attorney's office, the violations of Constitutional rights were planned and part of a pattern and practice by SLMPD.  For example, the following text messages were sent by police in advance of the events giving rise to this Complaint:

     a.     "The more the merrier!!! It's gonna get IGNORANT tonight!! But it's gonna be a of lot of fun beating the hell out of these shitheads once the sun goes down and nobody can tell us apart!!!!"

     b.     "R u guys in [South Patrol Division] prepping anything for the war tonight?"

     c.     "We reloading these fools up on prisoner busses. As they got on we all said in unison 'OUR STREETS' haha."

     d.     "Yeah. A lot of cops gettin hurt, but it's still a blast beating people that deserve it. And I'm not one of the people hurt, so I'm still enjoying each night."

     e.     "The problem is when they start acting like fools, we start beating the shit out of everyone on the street after we give two warnings."

38.     These messages are additional evidence that Defendants were motivated, before, during and after the events described herein by a common desire to deter speech and assembly, even to punish it.

39.     These text messages also reveal a conspiracy to hide their identities, and that police officers viewed these interactions with citizens as a "Us v. Them" situation, rather than an effort to keep the peace while people exercised their constitutional rights.

40.     The text messages, and the additional behavior described in this complaint, prove that any alleged justification for the kettling, use of chemical agents, excessive force, and arrests were pretext – attempts to justify the illegal behavior of the Defendants.

### B.     Post-Ferguson Federal Court Proceedings

41.     In October 2014, SLMPD fired chemical agents at protestors on South Grand.

42.     In November 2014, SLMPD officers fired chemical agents at protestors on South Grand as well as into a business where peaceful protestors had congregated. SLMPD officers refused to allow the protestors to leave.

43.    On December 11, 2014, a federal judge in this District issued a temporary restraining order enjoining the SLMPD from enforcing any rule, policy, or practice that grants law enforcement officials the authority or discretion to:

(1)    utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis

(a)    without first issuing clear and unambiguous warnings that such chemical agents will be utilized;
(b)    without providing the individuals sufficient opportunity to heed the warnings and exit the area;
(c)    without minimizing the impact of such chemical agents on individuals who are complying with lawful law enforcement commands; and
(d)    without ensuring that there is a means of safe egress from the area that is available to the individuals; and

(2)    utilize chemical agents on individuals engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis for the purpose of frightening them or punishing them for exercising their constitutional rights.

*See* Temporary Restraining Order in *Templeton v. Dotson*, No. 4:14-cv-02019 (E.D. Mo. Dec. 11, 2014) at 3.

44.    This suit was in response to SLMPD firing chemical agents into a business where peaceful protestors had congregated without allowing the protestors to leave.

45.    The City entered into a settlement agreement on March 25, 2015, where it agreed as follows:

A.    Defendants and their agents, servants, employees, and representatives, will not enforce any rule, policy, or practice that grants law enforcement officials the authority or discretion to:
(1)    utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in non-criminal activity:

(a)    without first issuing clear and unambiguous warnings that such chemical agents will be utilized;

12

(b)      without providing the individuals sufficient opportunity to heed the warnings and exit the area;

(c)      without reasonably attempting to minimize the impact of such chemical agents on individuals who are complying with lawful law enforcement commands; and

(d)      without ensuring that there is a means of safe egress from the area that is available to the individuals and announcing this means of egress to the group of individuals.

(2)      utilize chemical agents on individuals engaged in non-criminal activity for the purpose of frightening them or punishing them for exercising their constitutional rights.

B.      Provided, however, that Paragraph A hereof shall not be applicable to situations that turn violent and persons at the scene present an imminent threat of bodily harm to persons or damage to property, and when law enforcement officials must defend themselves or other persons or property against such imminent threat.

*See* Settlement Agreement in *Templeton v. Dotson*, No. 4:14-cv-02019 (E.D. Mo. Mar. 25,

2015) at 1-2.

## C.      SLMPD Violations of the Consent Decree

46.      On May 19, 2015, in response to protests over the St. Louis Circuit Attorney's office's refusal to charge another SLMPD officer for killing another African-American man, SLMPD officers deployed chemical agents against peaceful, non-criminal protestors without warning.

47.      On August 19, 2015, a protest occurred because SLMPD officers killed another African-American man in the Fountain Park neighborhood. According to the testimony of Sarah Molina, a local attorney, SLMPD officers indiscriminately used chemical agents without giving an audible and intelligible warning at the intersection of Walton Avenue and Page Boulevard. Molina testified that SLMPD officers fired chemical agents at her without giving her an opportunity to leave. SLMPD officers continued using chemical agents against people fleeing the area and even fired chemical agents at people peacefully standing on or in their own properties. Thirty minutes after the protests had dissipated, SLMPD officers returned and fired chemical agents at Ms. Molina, who was standing on property that she owns.

13

48.    On July 21, 2017, SLMPD officers used chemical agents against people protesting the treatment of detainees in the St. Louis City Workhouse. Although a few people did engage in unlawful activity earlier in the night, SLMPD officers pepper sprayed numerous people, none of whom were involved in criminal activity or were even at the same location as the criminal activity. These protesters were engaged in non-violent protesting when SLMPD officers sprayed them with chemical agents.

49.    Defendants' action in the instant matter follows the same script whereby SLMPD officers violate the Constitutional rights of people expressing their First Amendment right to protest against the police. Defendants' pattern and practice of illegally arresting and using chemical munitions against peaceful citizens is not only well documented but is detailed in *Ahmad* and *Templeton.*

### D.    The Buildup to the Kettling on September 17, 2017

43.    This pattern and practice of utilizing chemical agents on individuals engaged in peaceful, non-criminal activity continued on September 17, 2017.

44.    According to Defendant Rossomanno, on September 17, 2017, between 8:00 PM and 9:00 PM, a handful of individuals broke windows and destroyed flowerpots on the 900, 1000, and 1100 blocks of Olive Street in downtown St. Louis.

45.    There is no evidence nor allegations that Plaintiffs were in any way involved in this destruction of property.

46.    Defendants testified that Defendant Leyshock was the incident commander directing all of the supervisors including the other named Defendants.

47.    Defendants testified that Defendant Sachs was in direct command of the officers in tactical gear.

48.    Defendant Rossomanno also testified that at approximately 8:48 PM the small number of protestors present at the time were ordered to disperse and could "be subject to arrest and/or chemical munitions."

14

49.     Defendant Rossomanno testified that a second dispersal order was given at 8:51 PM.

50.     Defendants Rossomanno and Jemerson directed people to the intersection of Washington and Tucker, where the Defendants had already decided that they would kettle, pepper spray, beat, and illegally arrest Plaintiff.

51.     Although Defendant Sachs heard some sort of order being given, he testified that he could not make out "exactly what was being said."

### E.      The Kettling

52.     Over the next two plus hours, Defendant Officers began blocking roads and directing civilians to the intersection of Washington Avenue and Tucker Boulevard.

53.     Defendant Karnowski testified that he and the officers under his command began to "push (the protestors) north" toward Washington Avenue and Tucker Boulevard.

54.     This area is home to many condominiums, apartment buildings, and businesses, including restaurants and bars.

55.     Defendant Sachs came up with the plan to arrest everyone present. He presented his plan to Defendant Leyshock, who approved the plan. The plan was to not let anyone leave that was in the vicinity of Washington Avenue and Tucker Boulevard.

56.     Defendants Leyshock, Sachs, Rossomanno, and Jemerson knew or should have known that their plan to kettle the people that SLMPD directed to the intersection of Washington and Tucker and arrest them, merely for being present, would result in arrests without probable cause and the unjustified use of force to effectuate said arrests.

57.     At approximately 11:15 PM or 11:20 PM, Defendant Officers began forming into lines.

58.     This was nearly three hours after the windows and flowerpots were broken and many blocks away from the damaged businesses.

59.     SLMPD's Civil Disobedience Team appeared at the scene.

15

60.     According to the Civil Disobedience Response Operations Plan created by the SLMPD, the Civil Disobedience Team was broken down into South, Central and North Patrols, each further broken down into Alpha, Bravo, Charlie, Delta squads and arrest teams ("CDT Squads").

61.     In addition to the CDT Squads, officers from the Bicycle Response Team, Mobile Reserve - SWAT and Special Operations Unit actively participated in the kettling, arrest, and use of force on Plaintiff and other citizens at the corner of Tucker and Washington.

62.     As identified in the Civil Disobedience Response Operations Plan, the police report of the incident, and the videos taken by the City, each Supervisor Officer is a supervisor of one of the participating CDT Squads, Bicycle Response Team, Special Operations team or Mobile Reserve – SWAT team.

63.     The Supervisor Officers were an integral part of the kettling and subsequent use of excessive force because they directed their subordinates to participate in the kettle and unlawfully seize Plaintiff and the other citizens arrested that night.

64.     A line of Defendant Officers extended across all of the street and sidewalk on Washington Avenue one block west of Tucker Boulevard.

65.     A line of Defendant Officers extended across all of the street and sidewalk on Tucker Boulevard one block north of Washington Avenue.

66.     A line of Defendant Officers extended across all of the street and sidewalk on Tucker Boulevard one block south of Washington Avenue.

67.     All three of these lines were comprised of Defendant Officers all wearing military-like tactical dress, including helmets. These Defendant Officers were carrying long wooden batons and full-body riot shields.

68.     A fourth line of Defendant Officers extended across all of the street and sidewalk on Washington Avenue one half block east of Tucker Boulevard.

69.     These Defendant Officers were carrying bicycles and were being directed by Defendant Boyher.

70.     Each of the four lines began to approach the intersection of Washington Avenue and Tucker Boulevard.

71.     Without further instruction or warning, Defendant Officers surrounded Downtown residents, business patrons, protestors, observers, and members of the press, cutting off all routes of egress - including via any sidewalk - and prohibiting the people trapped inside from leaving.

72.     As they approached, Defendant Officers began banging batons against their riot shields and the street in unison causing a foreboding and terrifying sound, akin to a war march.

73.     As Defendant Officers began to close in on the citizens that SLMPD had forced into the intersection of Washington Avenue and Tucker Boulevard, Defendant Officers blocked anyone from leaving the area.

74.     Video evidence shows multiple citizens approaching Defendant Officers and requesting to be let through. These peaceful and lawful requests were not only ignored but responded to by screams of "get back!"

75.     In addition, the closing phalanxes of Defendant Officers cut off access to all alleys and other means of egress.

76.     As the four lines closed, Defendant Officers trapped everyone who was within a one-block radius of the intersection of Washington Avenue and Tucker Boulevard.

77.     This is a law enforcement tactic known as "kettling."

78.     Defendant Officers kettled self-admitted protestors, residents who merely lived in the area, people visiting businesses in the area, reporters, documentarians, a homeless person, and an even an undercover SLMPD officer.

79.     Video evidence even shows the officers grabbing an African-American male who was outside of the kettle and throwing him into the kettle.

80.     As the kettle closed, video evidence shows many individuals approaching the officers and begging to pass.

81.     Not surprisingly, the individuals in the kettle gravitated toward the line of bicycle officers rather than three lines of police in military gear, who were banging wooden batons against their riot shields.

82.     Video evidence shows individuals peacefully approaching the bicycle officers with their hands up.

83.     In response, the bicycle officers began to aggressively jab at the individuals using their bicycles as battering rams.

84.     Defendants Boyher and Karnowski were directing these Defendant Officers. Rather than defuse the situation, Defendants Boyher and Karnowski directed Defendant Officers under their command to use force against the peacefully assembled people and supervised the unlawful arrests.

85.     Almost instantly and in unison, the other individuals in the kettle put their hands in the air as a sign of peaceful surrender.

86.     Video shows Defendant Karnowski instigated the violence by pepper spraying a peaceful, obedient citizen whose hands were up.

87.     Many individuals laid prostrate on the ground. Others sat down. And others, who could not fully get to the ground because of the mass of people inside of the kettle, got as close to the ground as possible.

88.     Video evidence shows Defendants Aubuchon, Burle, and Kiphart then began to indiscriminately pepper spraying the crowd causing many of the Class members to suffering pain from the chemical munitions and terrorizing the Class

89.     Even though video evidence shows that none of the individuals inside the kettle were acting violently or aggressively, the individuals in the kettle were indiscriminately and repeatedly doused with chemical agents without warning by SLMPD officers, including Defendants Aubuchon, Burle, Kiphart, and Karnowski.

90.     SLMPD officers, including Defendants Aubuchon, Burle, Busso, Coats, Daut, Flowers, Gilman, Karnowski, Kiphart, Nicholas Lee, Trenton Lee, Lemons, Long, McNamara, Nizick, Partee, Rodriguez, and Thacker used excessive force against Class members by kicking, beating, choking, dragging, pepper spraying, or using inappropriate force. The use of excessive forces by these and other yet to be identified officers caused many of the Class members to suffer pain and terrorized the Class.

91.     Specifically, Defendants Aubuchon, Burle, Daut, Kiphart, Karnowski, Long, and Nizick have been identified as officers who indiscriminately pepper sprayed Class members who were compliant and not breaking the law. This caused many of the Class members to suffer pain and terrorized the Class.

92.     Defendants Burle, Busso, Coats, Daut, Flowers, Gilman, Nicholas Lee, Trenton Lee, Lemons, McNamara, Rodriguez, and Thacker have been identified as officers who indiscriminately used physical force while beating citizens who were compliant and not breaking the law. This caused many of the Class members to suffer pain and terrorized the Class.

93.     One of the Supervisor Officers, Defendant Kiphart, viciously attacked a journalist with a camera with pepper spray from a "fogger" which also sprayed indiscriminately into the crowd. Moments later, Detective Matthew Burle deployed another fogger blast towards the same journalist and those sitting near him with more pepper spray in the face, yet another concrete example of a subordinate officer taking a cue from a Supervisor Officer to engage in unconstitutional excessive force.

19

94.     Some individuals caught in the kettle had been wearing goggles because they feared the deployment of chemical agents, based on the SLMPD's well known pattern and practice of using chemical agents against peaceful protestors.

95.     Others found paper masks on the ground or other objects in order to protect themselves as it became apparent that SLMPD was preparing to effectuate illegal and likely violent arrests.

96.     In response, Defendant Officers roughly removed the goggles and then sprayed some of those individuals directly in the face.

97.     At the same time, Defendant Officers screamed derogatory and homophobic epithets at individuals as they were being arrested.

98.     These punitive measures were delivered by Defendant Officers without regard to the fact that the individuals were peaceful and compliant.

99.     Defendants Jemerson, Rossomanno, and other Supervisor Officers were within arms-length of SLMPD officers who were pepper spraying and beating peaceful and compliant citizens. Rather than instructing these officers to cease violating the civil right of the citizens, these Defendants took control of the situation and directed the officers' unlawful actions.

100.    Defendant Rossomanno can be seen on video within arms-length of SLMPD officers who were pepper spraying and beating peaceful and compliant citizens. Rather than instructing these officers to cease violating the civil right of the citizens, Defendant Rossomanno took control of the situation and directed the officers' unlawful actions.

101.    The Supervisor Officers were directing these officers.

102.    Defendant Rossomanno has conceded in his testimony that he did not observe any citizens use any violence. He has stated affirmatively that he believes the police should have gone home. He stated that no force should have been used and no one should have been seized.

20

103.   Rather than heed Rossomanno's advice and defuse the situation, many of the Supervisor Officers, including Rossomanno, directed the officers under their command to use force against the peacefully assembled people and supervised the unlawful arrests of Plaintiffs and the Class. The other Supervisor Officers made no attempt to stop the illegal use of force and the unlawful arrests.

104.   Some Supervisor Officers, including Defendants Karnowski, Aubuchon, and Kiphart, actively engaged in the use of excessive force by arbitrarily and unconstitutionally pepper spraying peaceful citizens who obeyed police orders, to the extent they were even given. The actions of these Supervisor Officers caused Plaintiffs and the Class to experience chaos, fear, and terror.

105.   Those other Supervisor Officers that did not actually deploy pepper spray or put their hands on citizens still stood and watched as SLMPD officers used excessive force and failed to intervene despite having the authority and opportunity to do so.

106.   Some of the Supervisor Officers, including Defendants Aubuchon, Kiphart, and Karnowski, actively engaged in the unconstitutional use of pepper spray on innocent civilians that comprise the Class. The other Supervisor Officers stood by and watched as civilians, including Plaintiffs, were unconstitutionally arrested, beaten, pepper-sprayed, and failed to intervene in the violation of Plaintiffs' civil rights.

107.   The Supervisor Officers actively participated, encouraged, and allowed the use of excessive force.

108.   The Supervisor Officers issued orders allowing their subordinates to use excessive force.

109.   The Supervisor Officers witnessed excessive force used on peaceful citizens who were not resisting.

110.   The Supervisor Officers observed the use of excessive force and, instead of discouraging it, implicitly and explicitly allowed it and did not intervene to prevent it.

111.    The Supervisor Officers knew that force was being used upon citizens who had committed no crime, were not resisting, and who posed no threat to the officers or others.  Despite this the Supervisor Officers showed a deliberate indifference to the illegal acts.

112.    The Supervisor Officers, during and after the excessive force, authorized and ratified the behavior of the other officers who used excessive force.

113.    Defendant Officers used hard plastic zip ties to arrest all of the individuals.

114.    The Arresting Officers listed in ¶ 17 arrested 123 people that night without justification.

115.    During and after the arrests, Defendant Officers were observed high fiving each other, smoking celebratory cigars, taking selfies on their personal phones with arrestees against the arrestees will, and chanting "Whose Streets? Our Streets!"

116.    That evening, the following celebratory picture was posted on Twitter by an anonymous person:



117.    By the coordinated actions of the officers in circling the assembly into the kettle and the systematic disbursement of the chemical agents, it is clear that these tactics were planned and that senior officials of the SLMPD not only had notice of but actually sanctioned the conduct of Defendants.

118.    Defendants' actions did not occur randomly. Rather, Defendants decided beforehand that they would make an example of the arrestees in an attempt to scare other citizens from exercising their First Amendment rights to protest against the SLMPD's actions.

119.    The next day, Defendant O'Toole, who was the SLMPD acting Chief of Police on September 17, 2017, reinforced the City's ratification of the Defendants' actions when he said, "I'm proud to say the city of St. Louis and the police owned the night," while standing next to St. Louis Mayor Lyda Krewson.

120.    The day after the arrests, Mayor Krewson further validated the illegal actions of Defendant Officers when she thanked the officers "for the outstanding job they have been doing over the last three days." She added that she fully supported the actions of the officers.

121.    On November 29, 2018, four SLMPD officer, including Defendant Myers, were indicted for their actions on September 17, 2017. Emails quoted in the indictment show that the officers were informed ahead of time that they would be deployed wearing military-like tactical dress to conceal their identities in order to beat protestors. This is exactly what occurred to Plaintiff, under the direct supervision and control of Defendants O'Toole, Leyshock, Boyher, Sachs, Jemerson, Karnowski, and Rossomanno.

122.    Defendants O'Toole, Leyshock, Boyher, Sachs, Jemerson, Karnowski, and Rossomanno were the architects of the police actions on September 17, 2017, and but for their actions, the Class would not have suffered injuries.

123.    The actions described here constitute illegal seizures, the use of excessive force, and arrest without probable cause. The acts occurred to the entire class and constitute constitutional violations against the entire class.

### F.    Federal Court Injunctive Relief

124.    On November 15, 2017, a judge in this District barred SLMPD from using many of the tactics described in this complaint. *See* Memorandum and Order of Preliminary Injunction, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017).

125.    The Court found that "[p]rotest activity began shortly after the announcement of the verdict on the morning of September 15, 2017. Protesters assembled in front of the state courthouse downtown near Tucker and Market streets. They did not have a permit to protest because the City of St. Louis does not require, and will not provide, a permit for protests." *Id*. at 2.

126.    The Court found that on September 17, 2017, there was some property damage downtown but Defendant Sachs "testified that he was unaware of any property damage occurring in the downtown area after 8:30 PM". *Id*. at 9.

127.    The Court found that Defendant Rossomanno gave a dispersal order before 10:00 PM but that "this order did not specify how far protesters had to go to comply with the directive to leave the area." *Id*. at 8. The Court noted that Defendant Sachs "could not say 'exactly how far would be enough' to comply with this, or any, dispersal order." *Id*. at 8-9.

128.    The Court found that Defendant Sachs "testified that around 10:00 PM the decision was made to make a mass arrest of people remaining in the area of Tucker and Washington, which is three or four blocks away from where the earlier dispersal order was given." *Id.* at 9. Yet, SLMPD continued to "freely allowed people ingress into the area after the initial dispersal order was given." *Id.* at 11.

129.    The Court found that at approximately 11:30 PM SLMPD began a mass arrest of everyone in the vicinity even though video evidence presented to the Court "does not shows a large crowd congregating in the streets" and "(n)o violent activity by protesters can be observed on the video." *Id.* at 10. In fact, the "scene appears calm and most people appear relaxed." *Id.* at 10-11. The only signs of

24

disobedience seen on the video are "four to five individuals" sitting on Tucker Avenue, which was closed, and a small group of people yelling at the police. *Id.* at 10.

130.    The video was taken from approximately 10:45 PM to the time of the arrests at 11:30 PM *Id.* at 12. The Court found that no audible warning could be heard on the video. *Id.*

131.    The video "shows an unidentified officer walking around with a hand-held fogger shooting pepper spray at the arrestees, who all appear to be on the ground and complying with police commands. This officer issues no verbal commands to any arrestee, and no arrestee on the video appears to be resisting arrest. The video shows other officers shouting at people on the ground and making threatening gestures at them with mace. An unidentified (person) lying face down on the ground is picked up by his feet by two officers and dragged across the pavement." *Id.* at 15-16.

132.    In an attempt to defend the SLMPD's actions, the City's attorney "stated during closing arguments that 'the police have the right to tell people, at this point, we're done for the evening; there's no – no more assembling; this assembly is over.'" *Id.* at 37. Not surprisingly, the Court did not adopt this rationale as a basis for the arrests and the use of chemical agents.

133.    The Court made the following findings:

a.      Plaintiffs are likely to prevail on the merits of their claims that the policies or customs of defendant discussed below violate the constitutional rights of plaintiffs. *Id.* at 35-36.

b.      Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit any officer to declare an unlawful assembly in the absence of the force or violence requirement of St.

Louis City Ordinance 17.16.275 and Mo. Rev. Stat. § 574.060, in violation of plaintiffs' First and Fourth Amendment rights. *Id.* at 36.

c.      Plaintiffs' evidence of the activities in the Washington and Tucker intersection on September 17, 2017, **shows no credible threat of force or violence to officers or property in this mixed commercial and residential area**. *Id*. at 37. (Emphasis added).

d.      Plaintiffs have presented sufficient evidence for purposes of awarding preliminary injunctive relief that defendant's custom or policy of committing discretionary authority to police officers to declare unlawful assemblies in the absence of any threat of force or violent activity provides no notice to citizens of what conduct is unlawful, and it permits officers to arbitrarily declare "there's no more assembling." *Id*. at 37-38. Plaintiffs have presented sufficient evidence at this stage of the proceedings that this discretion was in fact exercised in such a manner in violation of plaintiffs' constitutional rights. *Id*.

e.      Similarly, Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit officers to issue vague dispersal orders to protesters exercising their first amendment rights in an arbitrary and retaliatory way and then to enforce those dispersal orders without sufficient notice and opportunity to comply before being subjected to uses of force or arrest, in violation of Plaintiffs' First and Fourth Amendment rights. *Id*. at 39.

f.      Plaintiffs presented sufficient, credible evidence for purposes of awarding preliminary injunctive relief that defendant has a custom or policy, in the absence of exigent circumstances, of issuing dispersal orders to citizens engaged in expressive activity critical of police which are either too remote in time and/or too vaguely worded to provide citizens with sufficient notice and a reasonable opportunity to comply, inaudible and/or not repeated with sufficient frequency and/or by a sufficient number of officers to provide citizens with sufficient notice and a reasonable opportunity to comply, contradictory and inconsistent, not uniformly enforced, and retaliatory. *Id*. at 40.

g.      Plaintiffs have also presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant has a custom or policy of using chemical agents without warning on citizens engaged in expressive activity that is critical of police or who are recording police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id*. at 41.

h.      Plaintiffs have presented sufficient, credible testimony and video evidence from numerous witnesses that they were maced without warning in the absence of exigent circumstances while they were not engaging in violent activity and either were not in defiance of police commands (because none were given) or were complying with those commands. *Id*. at 42.

i.      The City's custom or policy of authorizing the use of hand-held mace against non-violent protesters with no warning or opportunity to comply and in the absence of probable cause or exigent circumstances impermissibly circumvents the protections afforded by the *Templeton* settlement agreement and vests individual officers with unfettered discretion to exercise that authority in an arbitrary and retaliatory manner in violation of constitutional rights. *Id*. at 43-44.

j.      Plaintiffs' evidence — both video and testimony — shows that officers have exercised their discretion in an arbitrary and retaliatory fashion to punish protesters for voicing criticism of police or recording police conduct. When all of the evidence is considered, plaintiffs have met their burden of showing that they are likely to succeed on their claim that defendant has a custom or policy of deploying hand held pepper spray against citizens engaged in recording police or in expressive activity critical of police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id*. at 44.

k.      Plaintiffs have also presented sufficient evidence at this preliminary stage of the proceedings that the aforementioned customs or policies of defendant caused the violations of plaintiff's constitutional rights. *Id*. at 44. That is because "it is well-settled law that a loss of First

27

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 691 (8th Cir. 2008) (internal quotation marks and citations omitted), overruled on other grounds, *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (2012). *Id.* at 44-45.

134.    Upon information and belief, senior officials of the SLMPD were directing such actions and conduct and/or tacitly accepting and encouraging such conduct by not preventing officers from engaging in such conduct and by not disciplining them when they did engage in such actions and conduct.

## CLASS ALLEGATIONS

135.    The Named Plaintiffs bring this action on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis.

136.    The class is defined as: all people who were kettled and arrested on September 17, 2017, at the corner of Tucker Boulevard and Washington Avenue.

137.    A class action is a superior means by which Plaintiffs and putative class members can challenge the City's unlawful actions on September 17, 2017.

138.    This action is brought and may properly be maintained as a class action pursuant to  Rules 23(a)(1)-(4) and 23(b)(1) and (3) of the Federal Rules of Civil Procedure.

139.    The case also meets the requirements of Federal Rule of Civil Procedure 23(c)(4) as it presents core issues that, when resolved, drive resolution of liability for the class.

140.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

141.    The class meets the requirements of Federal Rule of Civil Procedure 23(a), as follows:

a.      The requirements of Rule 23(a)(1) are satisfied because the class is sufficiently numerous that joinder is impractical. There are approximately 123 class members.

b. The requirements of Rule 23(a)(2) are satisfied because there are questions of law or fact common to the class and each of the subclasses. The common questions of law include:

i. whether the planning, design and implementation of the kettling of protestors was merely pretextual and as a result, the unlawful intent was solely to terrorize and instill fear in citizens so that fewer anti-police protests would take place in violation of citizens' constitutional rights and Missouri law;

ii. whether the Named Plaintiffs and the putative class were seized when Defendants herded, corralled, and trapped them in the detainment area, detained them for hours, deprived them the freedom to leave in violation of their Fourth Amendment rights to be free from unreasonable search and seizure, and other constitutional and common law rights;

iii. whether the Named Plaintiffs and putative class were falsely imprisoned when kettled;

iv. whether Defendants lacked the requisite probable cause to seize the Named Plaintiffs and the putative class, thereby violating their Fourth Amendment rights to be free from unreasonable search and seizure and other constitutional and common law rights;

v. whether the Defendants lacked the requisite probable cause to arrest and take the Named Plaintiffs and the putative class into custody and detain them at the Justice Center, thereby violating their Fourth Amendment rights to be free from unreasonable search and seizure other constitutional and common law rights;

vi. whether the Named Plaintiffs and the putative class were lawfully exercising their rights to freedom of speech, association, and assembly when standing on the streets and sidewalks, as guaranteed by the United States and Missouri Constitutions;

vii.     whether the Named Plaintiffs and the putative class who were lawfully on the public streets and sidewalks were acting reasonably within time, place, and manner restrictions;

viii.    whether Defendants violated the rights of the Named Plaintiffs and the putative class to freedom of expression, association, press, and assembly;

ix.      whether Defendants conspired to use excessive force, including the use of chemical munitions, against Named Plaintiffs and the putative class;

x.       whether the decision to initiate or conduct the mass arrests and the orders concerning the manner in which Named Plaintiffs and the putative class were to be herded, corralled, and trapped were made by officers of sufficient rank, authority, influence, and discretion that they can be deemed policymakers under *Monell* and its progeny;

xi.      whether Defendants, including high ranking officials of the SLMPD, conspired and agreed and/or otherwise acted jointly among and between themselves to herd, corral, trap and unlawfully detain, arrest and imprison Named Plaintiffs and the putative class;

xii.     whether the decision to use excessive force, including the use of chemical munitions, were made by officers of sufficient rank, authority, influence, and discretion that they can be deemed policymakers under *Monell* and its progeny;

xiii.    whether Defendants, including high ranking officials of the SLMPD, conspired and agreed and/or otherwise acted jointly among and between themselves to use excessive force, including the use of chemical munitions, against Named Plaintiffs and the putative class;

xiv.     whether Defendants maliciously prosecuted Named Plaintiffs and the putative class by filing false charges;

xv.     Whether the use of excessive force by the Abusive Officers and Defendants Aubuchon, Karnowski, and Kiphart at the behest of the Supervisor Officers caused emotional distress to the Named Plaintiffs and the putative class.

c.     The common questions of fact include:

i.     whether Defendants herded, corralled, trapped, and detained Named Plaintiffs and the putative class preventing them from leaving the detainment area;

ii.     whether the Defendants had any legal right to require Named Plaintiff and the putative class to disperse;

iii.     whether the kettling, force, and arrests were part of a cohesive plan to deter speech and assembly;

iv.     whether the kettling, force, and arrests were pre-planned to occur regardless of the behavior of the protesters;

v.     whether each and every defendant was part of a conspiracy to carry out the plan to deter speech and assembly;

vi.     whether the nature and extent of the training SLMPD police officers receive to conduct mass arrests is sufficient to protect citizens' constitutionally guaranteed rights;

vii.     whether there is a tacit or de facto SLMPD policy to intimidate, abuse and harass demonstrators at rallies and protests when those protests have messages that are critical of the police.

142.   The requirements of Rule 23(a)(3) are satisfied because Named Plaintiffs' claims are typical of the claims of the class they seek to represent.

143.   The requirements of Rule 23(a)(4) are satisfied because the representative parties will fairly and adequately protect the interest of the class they seek to represent. The Named Plaintiffs have no

interests antagonistic to those of the members of the class they seek to represent. Moreover, Named Plaintiffs have retained counsel experienced in litigating class actions and civil rights claims.

144.     The class meets the requirements of Rule 23(b)(l) because prosecution of separate actions by individual members of the class would create a risk of inconsistent or incompatible standards of conduct by the Defendants.

145.     Additionally, the class meets the requirements of Rule 23(b)(3) because common questions predominate over individual questions, and prosecution of this action as a class action is the superior method of adjudication. Factors that militate in favor of certification under Rule 23(b)(3) include:

a.      The interest of members in individually controlling the prosecution of separate actions is minimal and would be burdensome in view of the evidence required and costs of proving the claims alleged herein;

b.      It is desirable to concentrate the litigation in the United States District Court for the Eastern District of Missouri because the events occurred in this district and involve federally-protected rights; and

c.      Certification of the class will achieve great economies of time, effort, and expense and promote uniformity of decisions for the members of the class, thereby making a class action the superior method of adjudicating this controversy;

d.      A single action preserves court resources and avoids undue complication and costs;

e.      A single action preserves the resources of the City of St. Louis.

## ALLEGATIONS (STREET)

146.     At around 3:00 PM on September 17, 2017, Ms. Street arrived at SLMPD headquarters on Olive Street to participate in a protest of the Stockley verdict.

147.     Ms. Street observed a peaceful protest. Protesters were in the intersection, and SLMPD had police vehicles blocking off the road.

148.     Ms. Street and the other protesters marched westward, towards Jefferson Avenue, chanting along the way. The police followed behind the march. Eventually, Ms. Street stopped marching and got into the vehicle of a photographer she knew.

149.     As Ms. Street and the photographer reached the intersection of Grand and Forest Park Avenue, she saw about 30 officers dressed in riot gear, facing north. After marching and chanting for about 10 minutes, the protesters headed back east, towards SLMPD headquarters. The protest remained peaceful and ended at around 7:00 PM. About 60 protesters remained in the area, standing on sidewalks.

150.     At around 8:00 PM, the remaining protesters started marching towards the Arch. Ms. Street and another protester stayed behind to chat. About thirty minutes later, Ms. Street started walking, in an attempt to catch up with the other protesters. Ms. Street proceeded down 10th Street, towards Washington Avenue.

151.     Between 10:00 PM and 11:00 PM, Ms. Street observed police arrest a man who had been conducting a live video stream. She also observed the scene of accident that was unrelated to the protest.

152.     At around 11:00 PM, Ms. Street walked from the intersection of 8th Street and Locust Street, towards Tucker Avenue. Only about 20 protesters remained.

153.     Once Ms. Street reached Tucker and Locust, she saw officers dressed in riot gear and protesters on the sidewalks. Ms. Street continued towards Tucker and Washington.

154.     Ms. Street attempted to leave the area through what she believed to be the only remaining means of egress: towards 14th Street. However, by the time Ms. Street reached Washington and 13th Street, officers had blocked that path as well.

155.     As Ms. Street and three strangers approached the line, the officers told them they could not exit. One of those strangers was just coming home from work. Ms. Street and the others walked towards Washington and Tucker.

156.    The line of police screamed, "Move back!" repeatedly while moving towards Ms. Street and everyone else present. At that point, Ms. Street knew she was trapped and that she was being arrested.

157.    Defendant Officers started firing pepper spray and yelling for everyone to get on the ground. Ms. Street got on the ground.

158.    She could taste the pepper spray, so Ms. Street asked Defendant Jemerson, an SLMPD officer she knew, if she could put the facemask she was carrying over her face. Defendant Jemerson allowed Ms. Street to use her mask.

159.    Yet, another officer standing behind Defendant Jemerson jabbed Ms. Street with his baton, yelling, "We said do not move!"

160.    The force of the officer's blow knocked Ms. Street's glasses from her face. She quickly grabbed them to prevent them from breaking.

161.    After about five minutes of kneeling on the concrete, an officer zip tied Ms. Street's hands tight enough to cause excruciating pain.

162.    Ms. Street also observed members of the Class being pepper sprayed and beaten without justification. This caused her to experience increased terror and emotional distress.

163.    Defendant Officers moved Ms. Street to the sidewalk in front of 314 City Bar. She waited there for 20 minutes before she was moved to a police van and transported to the St. Louis City Justice Center.

164.    Defendant Officers took Ms. Street's glasses. She was unable to see until she was released from custody at about 11:00 am on September 18, 2017.

## ALLEGATIONS (HARRIS)

165.    On Sunday, September 17, 2017, Mr. Harris and three of his cousins arrived in downtown St. Louis to observe what they believed could be a historical event in the public outcry against police brutality.

166.    Mr. Harris and his cousins parked their vehicle on the parking lot at Soldier's Memorial between 10:00 or 10:30 PM.

167.    The atmosphere appeared to be that of any Sunday night. Many of the protesters had already left. Mr. Harris only noticed a handful of people outside; no one was blocking the road. Mr. Harris and his cousins intended to observe whatever remained of the protest and then head to Nara Café and Hookah Lounge on Washington Avenue.

168.    Mr. Harris noticed several riot gear-clad police officers posted at each intersection he and his cousins passed as they walked down Tucker Boulevard en route to Washington Avenue. The officers did not speak to Mr. Harris or his cousins. Mr. Harris received no indication that he was not allowed to be in the area.

169.    Once Mr. Harris and his cousins reached Washington Avenue, local press asked him a few questions. He spoke to them for about five minutes.

170.    Thereafter, Mr. Harris noticed a line of police officers moving from 14th Street towards Tucker Boulevard. He decided to try to get back to his vehicle at that time, as he was concerned the police were going to get aggressive.

171.    As Mr. Harris and his cousins walked past the intersection of Olive Street and Tucker Boulevard, another line of officers blocked their path, carrying shields and banging batons on the ground.

172.    Mr. Harris told the officers that he and his cousins were trying to leave, but they needed to pass the police line. The officers refused and told Mr. Harris and his cousins to walk back towards Washington Avenue. Mr. Harris and his cousins complied.

173.    Mr. Harris and his cousins walked back to the intersection of Tucker Boulevard and Washington Avenue and attempted to turn right onto Washington. However, a line of bicycle officers

confronted them. Mr. Harris explained that he and his cousins were trying to leave, but the officers pushed their bicycles towards them and ordered them to turn back around. Mr. Harris and his cousins complied.

174.    Seeing only one remaining path, Mr. Harris and his cousins attempted to turn right onto Tucker Boulevard. Their hopes were immediately dashed as they watched a line of officers approaching the intersection from that direction, carrying pepper spray and shields.

175.    With the kettle complete, officers ordered Mr. Harris and everyone else present to get onto the ground, yelling, "You fucking activists! Get down! Get down!"

176.    Mr. Harris immediately get down and laid on his stomach, and he urged those around him to do the same.

177.    Despite Mr. Harris's compliance, one officer stood on Mr. Harris's back. Another stood on Mr. Harris's neck. Simultaneously, officers sprayed Mr. Harris in the face with a continuous stream of pepper spray that left Mr. Harris choking for air.

178.    Mr. Harris felt the officers grabbing for his arms, so he moved them to his back, allowing them to zip tie his hands. Yet, the officers made the zip ties unbearably tight.

179.    Additionally, the officers removed Mr. Harris's cellphone from his hand before cuffing him and threw Mr. Harris's phone onto the ground. Mr. Harris has not seen his phone since.

180.    Mr. Harris advised the officers that the ties were too tight. They gleefully responded, "We don't care. You're a fucking activist."

181.    Officers yanked Mr. Harris from the ground by his arms, injuring his back and shoulders.

182.    Mr. Harris again advised the officers that his ties were too tight; his hands were numb. The officers repeated that they did not care about activists. Although Mr. Harris attempted to explain that he was not an activist, the officers ignored him and took him to the police wagon.

183. Mr. Harris also observed members of the Class being pepper sprayed and beaten without justification. This caused him to experience increased terror and emotional distress.

184. While being moved to the wagon, Mr. Harris asked officers to return his cellphone. They again ignored him and continued their refrain about activists getting what they deserve.

185. Once at the St. Louis City Justice Center, Mr. Harris was cramped into a cell with the other arrestees. There was not enough seating for everyone, the cell was oppressively hot, and, worse, Mr. Harris's zip ties were still painfully tight. The police did not remove the zip ties until Mr. Harris was booked hours later.

186. Again, Mr. Harris asked for his cellphone, but officers did nothing.

187. Mr. Harris was released at about noon on September 18, 2017. SLMPD never returned Mr. Harris's cellphone. Officers maintained that it was not among his property when he was booked.

188. For about three days, Mr. Harris had bruises on his back and neck, in the shapes of the officers' footprints. For a week, Mr. Harris had cuts on his wrists from the zip ties; his hands were swollen and numb. Two years later, Mr. Harris continues to experience intermittent numbness in his hands.

189. Mr. Harris is nervous and afraid around police now. He has no faith in them. He attended a protest as an observer, and he was violently attacked and arrested without justification, as a result. Since the unlawful beating. Mr. Harris has been too afraid to express his constitutional rights by attending or observing protests.

## ALLEGATIONS (McCAIN)

190. On Sunday, September 17, 2017, Mr. McCain and three of his family members arrived in downtown St. Louis to socialize and observe the protest.

191. As Mr. McCain and his family walked towards the intersection of Tucker Boulevard and Washington Avenue, Mr. McCain encountered small groups of people with whom he discussed the Stockley verdict.

192.    Mr. McCain noticed a police presence, but he did not believe anything was amiss. He did not observe any criminal acts or hear any dispersal orders. He had no idea that police were blocking means of egress.

193.    Once he and his family reached Tucker and Washington, Mr. McCain noticed people he knew from school, Facebook, and around town, so he approached them to socialize.

194.    After about 10-15 minutes at the intersection, a line of officers had reached his corner of the intersection and commanded him to stay back. Mr. McCain attempted to leave the area and return to the vehicle in which he had arrived.

195.    However, with the kettle complete, officers told him and everyone present to "get on the ground."

196.    Mr. McCain immediately complied, lying face down on the ground. Yet, officers pepper sprayed him several times.

197.    Next, the officers zip tied Mr. McCain's hands tightly behind his back, causing pain in his hands. Mr. McCain also sustained cuts on his elbows.

198.    Mr. McCain also observed members of the Class being pepper sprayed and beaten without justification. This caused him to experience increased terror and emotional distress.

199.    Finally, officers took a photograph of Mr. McCain and transported him to the St. Louis City Justice Center by police van.

200.    Mr. McCain washed the pepper spray from his own eyes when he reached the cell.

201.    Mr. McCain was released from jail 12 hours later.

## ALLEGATIONS (THEIS)

202.    On the evening of September 17, 2017, Ms. Theis went downtown with her two children to teach them about peaceful protests.

203.    Near SLMPD headquarters, Ms. Theis and her children witnessed a dark blue sedan with darkened windows, which she assumed belonged to law enforcement, circle a group of protesters and then abruptly lunge toward them and reverse, in an attempt to hit peaceful protestors, without warning, before driving off.

204.    After realizing that she and her children may have been in danger, Ms. Theis took her children home.

205.    Later in the evening, Ms. Theis returned to downtown with a friend, expecting to see large crowds gathering and marching. However, by the time Ms. Theis and her friend arrived downtown, all of the protests had ended.

206.    When she and her friend made it to Olive Street, near the Tucker Boulevard intersection, police came out of nowhere and surrounded their vehicle.

207.    After the large group of officers passed Ms. Theis, she and her friend decided to get out of their vehicle to record the officers' actions. Ms. Theis's friend gave her a camera.

208.    Ms. Theis and her friend walked silently on the sidewalk as they recorded the police.

209.    The first thing Ms. Theis saw was SLMPD officers dressed in military garb form a line and begin to chant loudly.

210.    Ms. Theis changed her position, so she could get a better angle of the police.

211.    At that point, a police officer in a white shirt, who Ms. Theis believed to be a supervisor, told Ms. Theis and her friend they were permitted to record as long as they stayed on the sidewalk.

212.    Ms. Theis immediately complied and joined members of the media, including a person known as "RebZ," on a sidewalk corner.

213.    It should have been apparent to anyone that Ms. Theis and the people she was gathered with were not protesting. Rather, they were exercising their constitutional rights to record law enforcement.

214.    Because she was with an easily identifiable group of media members, Ms. Theis believed that she was safe. Sadly, she was wrong.

215.    Throughout, Ms. Theis complied with the few directions that SLMPD officers gave her. When asked to move, she moved.

216.    Eventually, it became apparent to her that SLMPD officers were repositioning themselves to surround and kettle everyone present.

217.    However, Ms. Theis did not observe anyone disregarding commands or breaking any laws before the officers started corralling them.

218.    At that point, other than some chanting, the police were acting normally. They were smiling.

219.    Suddenly, the officers' demeanors grew hostile.

220.    Ms. Theis and her friend attempted to use an alley to get to their car, so they could leave.

221.    Ms. Theis encountered an SLMPD officer who blocked her path and directed Ms. Theis to Washington and Tucker. Ms. Theis immediately complied.

222.    Upon arriving at the intersection, Ms. Theis saw between 100 to 200 officers. The officers were pounding their batons against their shields and the ground.

223.    Terrified, Ms. Theis and her friend again attempted to get to the friend's car, which he had parked on Washington, just west of Tucker. When Ms. Theis arrived at her friend's vehicle and attempted to enter it, a large contingent of SLMPD officers prevented Ms. Theis from doing so. The officer was carrying a large baton. Ms. Theis and her friend begged to be allowed to leave.

224.    Police prevented Ms. Theis and her friend from getting in the car and leaving despite their desperate pleas.

225.    Instead, an SLMPD officer pointed a large can of pepper spray at Ms. Theis and told her to "get out of here or else." The officer directed Ms. Theis back to the intersection of Washington and Tucker.

226.    Ms. Theis complied. When she returned to the intersection, she encountered a large group of terrified people trying to leave the area. Ms. Theis and the rest of the group tried to leave by going east on Washington Avenue.

227.    They were prevented from leaving by a phalanx of bike officers spanning across the street and sidewalk.

228.    Ms. Theis and others repeatedly asked to be allowed to leave, but they were denied as officers used their shields to push protesters down and on top of each other.

229.    Ms. Theis was knocked to the ground, yelling to her friend "They are pushing us!"

230.    Within seconds and without warning, SLMPD officers began to indiscriminately pepper spray the people that had been kettled.

231.    Ms. Theis heard no instructions.

232.    Several officers grabbed Ms. Theis by the arms and legs while she was blinded by the pepper spray.

233.    The officers roughly zip-tied Ms. Theis, causing bruising on her wrists and arm.

234.    Police asked Ms. Theis for her name and identification, but she was unable to provide her identification because her phone and wallet had been knocked to the ground as she was dragged by officers.

235.    As she lay in compliance on the ground, Ms. Theis's foot and ankle were trampled by officers walking around her.

236.    Ms. Theis also observed members of the Class being pepper sprayed and beaten without justification. This caused her to experience increased terror and emotional distress.

237.    Approximately two minutes after being zip tied, Ms. Theis was thrown into a van with a metal interior.

238.    Ms. Theis was still blinded by the pepper spray but heard officers chanting "Everybody goes to jail" and "Whose streets? Our Streets!" as she sat in the van.

239.    When Ms. Theis asked for help from officers to ease her discomfort from being sprayed and zip tied, an officer responded, "Fuck you."

240.    At the jail, Ms. Theis asked the nurse for medical attention. Ms. Theis informed the nurse that Ms. Theis suffers from lupus and that her lupus manifests on her skin. The nurse said that the jail did not have anything to help Ms. Theis but that Ms. Theis was required to provide a urine sample to test for pregnancy. Even knowing that Ms. Theis's skin was extremely susceptible to pain and injury due to her lupus, the nurse made no effort to wash the pepper spray off of Ms. Theis's body.

241.    Ms. Theis spent just under 24 hours in jail, the whole time with pepper spray covering her skin, face, and eyes and causing her to feel like she was being tortured.

242.    Ms. Theis continues to suffer pain in her foot and arm as a result of the events of September 17, 2017.

243.    Ms. Theis experiences anxiety and depression as a result of the events of September 17, 2017.

244.    Since being pepper sprayed, Ms. Theis continues to experience severe eye pain and has suffered a degradation in her sight.

245.    Ms. Theis lost friends and lost her dream of being a journalist as a result of the events of September 17, 2017.

246.    Ms. Theis's children are vicariously traumatized by the event, from witnessing their mother's injuries and changed personality as a result of the events of September 17, 2017.

## ALLEGATIONS (WARRINGTON)

247.    At approximately noon on September 17, 2017, Ms. Warrington headed downtown to observe the protest at the Metropolitan Police Department, 1915 Olive Street.

248.    Ms. Warrington documented the goings-on by recording on her cellphone.

249.    At about 8:00 PM, the protesters started marching from the police station to the heart of downtown; Ms. Warrington followed to continue her observation. At all times, she did not participate in the lawful protests.

250.    By the time the protesters reached the intersection of Olive and Tucker Boulevard, the crowd dispersed, and people began to move more as individuals and small groups.

251.    Ms. Warrington continued behind the people traveling down Olive Street and her fellow observers followed other groups.

252.    As Ms. Warrington entered an alley off of Olive Street, she saw several people running from riot gear-clad police officers who had their weapons drawn.

253.    Alarmed, Ms. Warrington decided to meet back up with her fellow observers sometime between 8:30 and 9:00 PM.

254.    Ms. Warrington heard that the police were arresting a citizen near the Convention Center, so she and several other observers headed to Washington Avenue and observed that arrest.

255.    Afterwards, as Ms. Warrington and the other observers headed down Washington, back towards Tucker Boulevard, she noticed smaller groups of people on Tucker. Ms. Warrington believed people were trying to find the companions they lost track of when the large crowd separated.

256.    By about 10:30 PM, Ms. Warrington noticed an increased police presence on Tucker.

257.    At about 11:20 PM, Ms. Warrington saw a man pushing a baby in a stroller. Fearing that the larger police presence and potential deployment of pepper spray could create a dangerous environment

43

for the baby, Ms. Warrington separated from the other observers to warn the man to get his baby out of the area.

258.    Subsequently, Ms. Warrington rejoined one of her fellow observers and noticed a line of police behind that observers.

259.    Some of the other people in the area told Ms. Warrington that there was another line of police blocking another intersection, two blocks away.

260.    Ms. Warrington and her acquaintance decided that they needed to find their other friend from whom they had separated and then leave the area.

261.    Once they found him, Ms. Warrington and the two other observers tried to exit through an opening between police officers on the southeast side of the intersection of Washington and Tucker.

262.    At about 11:25 PM, as Ms. Warrington and the other observers approached the opening, the police dressed in riot gear yelled, "Move back! Move back!" and hit their batons on the ground. One of the officers had his pepper spray out.

263.    The officers moved towards Ms. Warrington and her companions, physically pushing them back into the intersection.

264.    Other officers pushed in from the other sides, cramming Ms. Warrington's group and other citizens into the intersection.

265.    Ms. Warrington was not committing any criminal acts at that time, nor had she at any point that night.

266.    Ms. Warrington did not observe anyone else committing any criminal acts at that time.

267.    Yet, with the kettle complete, the officers yelled to the crowd, "You're under arrest! Get down!"

268.    Ms. Warrington and everyone else immediately got on the ground.

269.    Ms. Warrington sat down and put her hands in the air.

270.    An officer told her to lie down, so Ms. Warrington put her cell phone, which was still recording, on her chest and laid on her back.

271.    An officer then told Ms. Warrington to lie on her stomach.

272.    Because she thought it safest to keep her hands in the air while she rolled over, Ms. Warrington's cell phone flew over her head as she turned.

273.    One officer picked up Ms. Warrington's phone and ended the recording. Another officer removed Ms. Warrington's backpack from her back.

274.    Ms. Warrington felt a warm liquid drip over her back and legs. At the time, Ms. Warrington believed an officer was urinating on her. She later learned that the officer sprayed her body with pepper spray.

275.    Ms. Warrington also observed members of the Class being pepper sprayed and beaten without justification. This caused her to experience increased terror and emotional distress.

276.    Within a few minutes, an officer zip-tied Ms. Warrington's hands behind her back. The officer kept pulling the ties tighter and tighter.

277.    A few minutes after that, an officer brought Ms. Warrington to her feet and took her to a van for transport to jail.

278.    Ms. Warrington was jailed for approximately twelve hours.

279.    Ms. Warrington sat in a cell with about three dozen other women. They all coughed and sneezed throughout the night from the pungent odor emanating from the pepper spray.

280.    The officers responsible for fingerprinting Ms. Warrington and the other arrestees coughed from the pepper spray, and one of them remarked, "Ah, the smell of justice."

281.    Ms. Warrington did not receive any medical treatment, but she was ordered to urinate in a cup to determine whether she was pregnant.

282.     Because the zip ties were applied so tightly, Ms. Warrington had visible marks on her wrists for 24 hours. Her left hand, from her wrist to her thumb, was numb for two weeks. Her right hand, from her wrist to her thumb, was numb for two months.

283.     The day after she was arrested, Ms. Warrington saw a motorcycle helmet on a counter as soon as she entered her workplace. At first glance, she thought the helmet was police-issued and that the police left it there as a warning.

284.     Ms. Warrington had to speak to a counselor.

285.     As a result of her arrest, Ms. Warrington believes she would be more likely to call a friend than police if she were in danger.

286.     Ms. Warrington does not believe police even see protestors as people.

## COUNT I
### 42 U.S.C. § 1983 – First and Fourteenth Amendment Violations
### (Against All Defendant Officers)

276.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

277.     Plaintiffs and the Class have a fundamental right to assemble and express Plaintiffs' views protected by the freedom of association and freedom of speech clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

278.     Defendant Officers' actions violated Plaintiffs' rights and the Class's rights under the First Amendment to freedom of speech and freedom of assembly by interfering with Plaintiffs ability to associate freely in public and express Plaintiffs' and the Class's views as part of a peaceful demonstration.

279.     Observing and recording public protests, and the police response to those protests, is also a legitimate means of gathering information for public dissemination that is protected by the freedom of speech and freedom of the press clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

280.     The Supervisor Officers directed officers to violate Plaintiffs' rights and the Class's rights under the First Amendment to freedom of speech and freedom of assembly by interfering with Plaintiffs' ability to associate freely in public and express Plaintiffs' views as part of a peaceful demonstration.

281.     The Arresting Officers violated Plaintiffs' rights and the Class's rights under the First Amendment to freedom of speech and freedom of assembly by interfering with Plaintiffs' ability to associate freely in public and express Plaintiffs' views as part of a peaceful demonstration by unlawfully seizing and arresting Plaintiffs and the Class.

282.     The Abusive Officers and Defendants Aubuchon, Karnowski, and Kiphart violated Plaintiffs' rights and the Class's rights under the First Amendment to freedom of speech and freedom of assembly by interfering with Plaintiffs' ability to associate freely in public and express Plaintiffs' views as part of a peaceful demonstration by using excessive force on Plaintiffs and the Class.

283.     Defendant Officers' actions violated Plaintiffs' and the Class's First Amendment rights to freedom of the press and freedom of speech by interfering with Plaintiffs' ability to gather information and cover a matter of public interest.

284.     Defendant Officers engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiffs' and the Class's First Amendment rights.

285.     As a direct and proximate result of Defendant Officers' unlawful actions described herein, Plaintiffs and the Class suffered damages, including physical injury, emotional trauma, great concern for Plaintiffs' and the Class's safety; fear, apprehension, depression, anxiety, consternation and emotional distress;

286.     Additionally, Defendant Officers' actions described herein have had a chilling effect on Plaintiffs and the Class, who are now less likely to participate in free public discourse.

287.     At all times, Defendant Officers were acting under color of state law.

47

288.     If Plaintiffs prevail, Plaintiffs are entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT II
### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment: Excessive Force
### (Against All Abusive Officers and Supervisor Officers)

286.     Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

287.     The use of force against Plaintiffs and the Class by Abusive Officers and Defendants Aubuchon, Karnowski, and Kiphart and other yet to be identified officers, individually and acting concert, including spraying with chemical munitions, kicking, punching, slapping, dragging, and standing on some of Plaintiffs' necks and backs, was objectively unreasonable.

288.     The use of kettling, without warning, was objectively unreasonable and constituted excessive force.

289.     Abusive Officers, Supervisor Officers, and other yet to be identified officers, herein planned, authorized, directed, ratified, personally participated in, and/or failed to prevent the conduct described herein.

290.     As a direct result of the conduct of Abusive Officers, Supervisor Officers,  and other yet to be identified officers, described herein, Plaintiffs and the Class suffered physical injury and emotional trauma.

291.     At all times, Abusive Officers, Supervisor Officers,  and other yet to be identified officers, were acting under color of state law.

292.     Abusive Officers, Supervisor Officers, and other yet to be identified officers, engaged in these actions willfully and knowingly, acting with reckless or deliberate indifference to the Plaintiffs' and the Class's Fourth Amendment rights. As a direct and proximate result of Defendants' unlawful actions, Plaintiffs and the Class were damaged.

293.    If Plaintiffs prevail, Plaintiffs are entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT III**
**42 U.S.C. § 1983 – Fourth and Fourteenth Amendment Violations**
**Unreasonable Search and Seizure**
**(Against All Arresting Officers and Supervisor Officers)**

295.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

296.    Arresting Officers and Defendant Rossomanno did not have probable cause to arrest Plaintiffs or the Class.

297.    Arresting Officers and Defendant Rossomanno unreasonably searched and seized Plaintiffs, thereby depriving Plaintiffs of their right to be free from unreasonable search and seizure of their person in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

298.    Arresting Officers and Supervisor Officers herein planned, authorized, directed, ratified, personally participated, and/or failed to prevent in the conduct described herein.

299.    Further, there was no objectively reasonable belief that Plaintiffs or the Class had committed a criminal offense, nor was there even arguable probable cause for the arrest. As such, the searches and seizures were unreasonable.

300.    Arresting Officers and Supervisor Officers engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiffs' and the Class's Fourth Amendment rights. As a direct and proximate result of Defendants' unlawful actions, Plaintiffs and the Class were damaged.

301.    At all times, Arresting Officers and Supervisor Officers were acting under color of state law.

302.    If Plaintiffs prevail, Plaintiffs are entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT IV[2]**
**42 U.S.C. § 1983 – Conspiracy to Deprive Civil Rights**
**(Against All Defendants)**

303.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

304.    Defendant Officers, acting in their individual capacities and under color of law, conspired together and with others, and reached a mutual understanding to undertake a course of conduct that violated Plaintiffs' and the Class's civil rights.

305.    The City of St. Louis itself was a member of the conspiracy because throughout the night, the highest levels of the SLMPD, Department of Public Safety, and City government were involved in the planning, monitoring and/or execution of this event.

306.    As described above, Defendants O'Toole Leyshock, Sachs, Jemerson, and Rossomanno conspired to design and implement the illegal kettling plan, with the intent to unlawfully arrest and use excessive force on Plaintiffs and the Class.

307.    Defendants Aubuchon, Boyher, Howard, Karnowski, and Kiphart joined the conspiracy when they directed officers under their control and supervision to execute the illegal kettling plan, with the intent to unlawfully arrest and use excessive force on Plaintiffs and the Class.

308.    The Supervisor Officers joined the conspiracy when they directed officers under their control and supervision to execute the illegal kettling plan, with the intent to unlawfully arrest and use excessive force on Plaintiff and the Class.

---

[2] On July 27, 2022, the Eighth Circuit of Appeals dismissed this Count. Plaintiff includes Count IV herein to preserve it for appeal.

309.    The Arresting Officers joined the conspiracy when they unlawfully seized and arrested Plaintiffs and the Class.

310.    The Abusive Officers and Defendants Aubuchon, Karnowski, and Kiphart joined the conspiracy when they used excessive force on Plaintiffs and the Class.

311.    The remaining Defendant Officers joined the conspiracy when they agreed to participate in the illegal kettling plan and then unlawfully arrested and used excessive force on Plaintiffs and the Class.

312.    All Defendants herein planned, authorized, directed, ratified, personally participated in, and/or failed to prevent the conduct described herein.

313.    In furtherance of this conspiracy, Defendants committed the following overt acts:

a.      Defendants, acting in concert, kettled and unlawfully seized Plaintiffs and the Class. They detained Plaintiffs in the City Justice Center for between 12 and 24 hours.

b.      Defendants used excessive force by deploying chemical agents against Plaintiffs and the Class.

c.      Defendants assaulted Plaintiffs and the Class by spraying them with chemical munitions; by kicking, punching, slapping, dragging Plaintiffs and Class members; and by standing on some of Plaintiffs' and Class members' necks and backs,.

314.    As a direct and proximate result of the conspiracy between Defendants and others as described above, Plaintiffs and the Class were subjected to assault; the use of excessive force; the deprivation of the right to be free from unreasonable search and seizure; and malicious prosecution.

315.    As a direct and proximate result of Defendants' actions, Plaintiffs and the Class suffered and will continue to suffer physical pain and injury and emotional trauma.

316.    The acts described herein were intentional and callously indifferent to the rights of Plaintiffs and the Class, thus entitling Plaintiffs and the Class to an award of punitive damages against the Defendants.

317.    At all times, Defendants were acting under color of state law.

318.    If Plaintiffs prevail, Plaintiffs are entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT V**
**42 U.S.C. § 1983 – Municipal Liability**
*Monell* **Claim for Failure to Train, Failure to Supervise, and for a Custom of Conducting**
**Unreasonable Search and Seizures and Use of Excessive Force**
**(Against Defendant City)**

324.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

325.    Defendant City is liable to Plaintiffs and the Class, pursuant to 42 U.S.C. § 1983, for the remaining Defendants' violations of Plaintiffs' and the Class's rights because the violations were caused by a policy, practice, or custom of the St. Louis Metropolitan Police Department. Among the SLMPD policies, practices, or customs that caused constitutional harm to Plaintiffs are the following:

a.    SLMPD officers' routine use of excessive force when policing protests, especially those at which police brutality is being protested;

b.    SLMPD's policy or custom of issuing vague and even contradictory dispersal orders without giving an opportunity to comply;

c.    SLMPD's policy of arbitrarily declaring unlawful assemblies in the absence of any threat or force or violent activity that provides no notice to citizens or unlawful conduct;

d.    Additionally, SLMPD has a custom, policy, or practice of violating the Fourth Amendment by regularly conducting unreasonable seizures and arresting individuals without probable cause.

326.     Defendant City had notice that its use of force training and officer supervision was inadequate and likely to result in constitutional violations based on multiple incidents of excessive force against protestors in October 2014, November 2014, July 2015, August 2015, and September 2017.

327.     Despite Defendant City's March 2015 *Templeton* settlement agreement, SLMPD officers continue to use chemical agents against non-violent citizens, illustrating Defendant City's deliberate and conscious choice to maintain training and supervision practices that give rise to constitutional violations.

328.     Even after the *Templeton* settlement and the incidents that gave rise to it, Defendant City did not initiate or require comprehensive retraining of its officers, despite repeated, similar constitutional violations perpetrated by SLMPD officers after that settlement and before the incident at issue in this case.

329.     In its failures, Defendant City has been deliberately indifferent to the rights of citizens, and these failures, policies, and customs are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Plaintiff as alleged herein.

330.     As a direct result of the Defendant City's failures, policies, and customs as described herein, Plaintiffs and the Class suffered damages, including physical injury, fear, apprehension, and concern for Plaintiffs' and the Class's safety.

331.     The decision to initiate or conduct the mass arrests and the orders concerning the manner in which Plaintiffs were kettled was made by officers of sufficient rank, authority, influence, and discretion that they can be deemed policymakers under *Monell* and its progeny.

332.     If Plaintiffs prevail, Plaintiffs are entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

<u>COUNT VI</u>
**Missouri State Law – Battery**
**(Against All Abusive Officers and All Supervisor Officers)**

333.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

334.     During the process of being unconstitutionally arrested, Plaintiffs and the Class suffered battery at the hands of Abusive Officers and Defendants Aubuchon, Karnowski, and Kiphart, and other yet to be identified officers.

335.     The physically aggressive tactics of Abusive Officers and Defendants Aubuchon, Karnowski, and Kiphart caused intentional and offensive bodily harm to Plaintiffs and the Class.

336.     In spraying Plaintiffs with pepper spray — when Plaintiffs and the Class were passive and complying with officer directives — Defendants Aubuchon, Burle, Karnowski, and Kiphart caused further intentional and offensive bodily contact.

337.     Abusive Officers, Supervisor Officers, and other yet to be identified officers, herein planned, authorized, directed, ratified, personally participated in, and/or failed to prevent the conduct described herein.

338.     As a direct result of the conduct of Abusive Officers and Supervisor Officers, and other yet to be identified officers, described herein, Plaintiffs and the Class suffered damages, including physical injury, emotional trauma, great concern for Plaintiffs' and the Class's safety; fear, apprehension, depression, anxiety, consternation and emotional distress.

339.     The actions of Abusive Officers and Supervisor Officers as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish these Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

## COUNT VII
### Missouri State Law – False Arrest
### (Against All Arresting Officers and All Supervisor Officers)

343.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

344.    Plaintiffs were arrested without any legal justification or probable cause by Defendants.

345.    Arresting Officer and Defendant Rossomanno proceeded to constrain and confine Plaintiffs against Plaintiffs' free will. There was no lawful justification for Defendants restraining and confining Plaintiffs in the above manner.

346.    Arresting Officers and Supervisor Officers herein planned, authorized, directed, ratified, personally participated in, and/or failed to prevent the conduct described herein.

347.    As a direct result of the conduct of Arresting Officers and Supervisor Officers described herein, Plaintiffs suffered damages, including physical injury, fear, apprehension, and emotional trauma.

348.    The actions of Arresting Officers and Supervisor Officers as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish these Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

349.    The actions of Arresting Officers and Supervisor Officers as described above were carried out in bad faith and with malice, such that punitive damages should be awarded to punish these Defendants and to deter them, as well as others similarly-situated individuals from engaging in similar conduct in the future, in an amount to be determined by a jury.

## COUNT XIII
### Missouri State Law – False Imprisonment
### (Arresting All Officers and All Supervisor Officers)

353.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

354.     Arresting Officers and Defendant Rossomanno intentionally restrained and confined Plaintiffs against Plaintiffs' will when they took Plaintiffs and the Class into custody and detained Plaintiffs and the Class.

355.     Plaintiffs and the Class did not consent to the actions of Arresting Officers and Defendant Rossomanno in removing and confining Plaintiffs and the Class in the manner described above, nor in any manner whatsoever.

356.     There was no lawful justification for Arresting Officers and Defendant Rossomanno to restrain and confine Plaintiffs and the Class in the manner described above.

357.     Arresting Officers and Defendant Rossomanno held Plaintiffs and the Class in confinement for a substantial period of time, spanning several hours.

358.     Arresting Officers and Supervisor Officers herein planned, authorized, directed, ratified, personally participated in, and/or failed to prevent the conduct described herein.

359.     As a direct and proximate result of Plaintiffs' false imprisonment by Arresting Officers and Supervisor Officers, Plaintiffs and the Class suffered damages, including physical injury, emotional trauma, great concern for Plaintiffs' and the Class's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress.

360.     The actions of Arresting Officers and Supervisor Officers in causing the false imprisonment of Plaintiffs, as described above, were carried out with an evil motive and/or reckless indifference and conscious disregard for Plaintiff's rights, thereby entitling Plaintiff to punitive damages

in an amount sufficient to punish and deter these Defendants and others similarly situated from like conduct in the future.

## COUNT IX
### Missouri State Law – Negligent Infliction of Emotional Distress
### (Against All Defendant Officers)

374.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

375.    By kettling, assaulting, and/or pepper spraying Plaintiffs and the Class, Defendant Officers realized or should have realized that their conduct posed an unreasonable risk to Plaintiffs.

376.    Further, Plaintiffs and the Class were reasonably in fear for Plaintiffs' and the Class's own person because of the actions of Defendant Officers and suffered emotional distress or mental injury that is medically diagnosable and sufficiently severe to be medically significant as a result of Defendant Officers' actions.

377.    All Defendant Officers herein planned, authorized, directed, ratified, personally participated in, and/or failed to prevent the conduct described herein.

378.    The actions of Defendant Officers as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish these Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

## COUNT X
### Missouri State Law – Conspiracy
### (Against All Defendant Officers)

379.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

380.    Defendant Officers, acting in their individual capacities and under color of law, conspired together and with others, and reached a mutual understanding to undertake a course of conduct that violated Plaintiffs' and the Class's civil rights.

381.    Defendant Officers entered into this conspiracy with the intent and objective to violate the civil rights of the Plaintiffs and the Class, as described herein.

382.    The Supervisor Officers joined the conspiracy when they directed officers under their control and supervision to execute the illegal kettling plan, with the intent to unlawfully arrest and use excessive force on Plaintiff and the Class.

383.    The Arresting Officers joined the conspiracy when they unlawfully seized and arrested Plaintiffs and the Class.

384.    The Abusive Officers and Defendants Aubuchon, Karnowski, and Kiphart joined the conspiracy when they used excessive force on Plaintiffs and the Class.

385.    As described above, Defendant Officers conspired to design, implement, and participate in the illegal kettling plan, with the intent to unlawfully arrest and use excessive force on Plaintiffs and the Class.

386.    In furtherance of this conspiracy, Defendants committed the following overt acts:

        a.      Defendant Officers, acting in concert, kettled and unlawfully seized Plaintiffs and the Class. They detained Plaintiffs and the Class in the City Justice Center for many hours.

        b.      Defendant Officers used excessive force by deploying chemical agents against Plaintiffs and the Class.

        c.      Defendant Officers assaulted and battered Plaintiffs and the Class.

        d.      Defendant Officers initiated charges against Plaintiffs and the Class that would chill a person of ordinary firmness.

387.    As a direct and proximate result of the conspiracy between Defendant Officers as described above, Plaintiffs and the Class were subjected to assault; the use of excessive force; the deprivation of the right to be free from unreasonable search and seizure; and malicious prosecution.

388.    As a direct and proximate result of Defendant Officers' actions, Plaintiffs and the Class suffered and will continue to suffer physical pain and injury and emotional trauma.

389.    At all times, Defendant Officers were acting under color of state law.

390.    As members of the conspiracy, Defendant Officers are jointly and severally liable for the damages to Plaintiffs.

340.    The actions of Defendant Officers as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish these Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

## COUNT XI
### Failure to Intervene
### (Against All Defendant Officers)

391.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

392.    Defendants Officers witnessed the tortious and unconstitutional actions of other officers at the scene and failed to intervene to prevent it from occurring and/or to lessen its severity.

393.    Defendant Officers knew that seizure of the putative class was unreasonable, without probable cause, and illegal.

394.    Defendant Officers knew that the force used against Plaintiffs and the Class was unreasonable under the circumstances and was clearly excessive.

395.    Defendant Officers had the opportunity and means to prevent the harm to Plaintiffs and the Class from occurring but failed to intercede by stopping the illegal seizure of and use of excessive force against the putative class.

396.    Defendant Officers acted under color of law.

397.    As a direct and proximate result of Defendants Officers' failure to intervene in the unlawful seizure and use of excessive force against Plaintiffs and the Class, Plaintiffs and the Class have suffered and will continue to suffer physical and emotional injuries and has suffered and will continue to suffer pain of the body and mind, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, and stress.

398.    The conduct of the Defendant Officers and each of them jointly and separately was reckless and callously indifferent to the constitutional rights of the putative class, malicious and wanton with respect to those rights, making an award of punitive damages warranted and necessary to punish them in their individual capacities and to deter each of them and others from the same or similar misconduct in the future.

## COUNT XII
### Missouri State Law – Abuse of Process
### (Against All Arresting Officers and All Supervisor Officers)

399.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

400.    Arresting Officers and Rossomanno seized, arrested, charged, and initiated criminal proceedings against Plaintiffs and the Class without justification with the purpose of violating the rights of Plaintiffs and the Class as described in the foregoing Counts.

401.    Supervisor Officers directed Arresting Officers and Rossomanno to seize, arrest, charge, and initiate criminal proceedings against Plaintiffs and the Class without justification with the purpose of violating the rights of Plaintiffs and the Class as described in the foregoing Counts..

402.    Arresting Officers and Rossomanno made an illegal, improper, and perverse use of process by arresting, charging, and detaining Plaintiffs and the Class without any legal justification or probable cause in order to harass and intimidate Plaintiff and the Class, which constitutes an improper collateral purpose.

403.    Supervisor Officers made an illegal, improper, and perverse use of process by directing Arresting Officers and Rossomanno to arrest, charge, and detain Plaintiffs and the Class without any legal justification or probable cause in order to harass and intimidate Plaintiff and the Class, which constitutes an improper collateral purpose.

404.    Arresting Officers and Rossomanno acted willfully and knowingly when they abused legal process for unlawful purposes and with an illegitimate collateral objective, in that Arresting Officers and Rossomanno used legal process through their authority for purposes other than the legitimate investigation and prosecution of criminal acts.

405.    Supervisor Officers acted willfully and knowingly when they abused legal process for unlawful purposes and with an illegitimate collateral objective, by directing Arresting Officers and Rossomanno to use legal process through their authority for purposes other than the legitimate investigation and prosecution of criminal acts.

374.    As a direct and proximate result of Arresting Officers' and Supervisor Officers' abuse of process, Plaintiffs and the Class suffered damages, including emotional trauma, great concern for Plaintiffs' and the Class's own safety; fear, apprehension, depression, anxiety, consternation, and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

375.    The actions of Arresting Officers and Supervisor Officers as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive

damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury

## COUNT XIII
### Missouri State Law – Malicious Prosecution
### (Against All Arresting Officers)

374.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

375.    Arresting Officers initiated criminal charges against Plaintiffs and the Class with no probable cause that Plaintiffs nor the Class had committed a crime or ordinance violation.

376.    Such charges were subsequently dismissed against Plaintiffs and the Class.

377.    The initiation of the criminal charges without probable cause against Plaintiffs and the Class was done with malice by the Arresting Officers.

378.    As a direct result of the conduct of Defendants described herein, Plaintiffs suffered damages, including physical injury, emotional trauma, great concern for Plaintiffs' own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society. All Defendants herein planned, authorized, directed, ratified, personally participated in, and/or failed to prevent the conduct described herein.

379.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

380.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

374.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims, pursuant to § 537.610.1, RSMo.

375.    The actions of Arresting Officers and Supervisor Officers as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury

**COUNT XVI**
**Procedural Due Process**
**(Against All Defendants)**

376.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

377.    Defendants claim that the basis for the arrest of Plaintiffs and the Class was a violation of St. Louis Code of Ords. 15.52.010 and 17.16.275 ("Ordinances").

378.    The Ordinances are unconstitutionally vague on their face and as applied to Plaintiffs and the Class and do not provide fair notice to a reasonable person as to how to comply with the law.

374.    Defendants have maintained that citizens are subject to arrest pursuant to the Ordinances for clearly constitutionally protected activity, such as peacefully congregating on sidewalks.

375.    The due process rights of the putative class were violated when the City of St. Louis, through its agent officers, failed to provide sufficient warning about the deployment of chemical agents, failed to provide an opportunity to disperse, failed to leave open routes of egress, and failed to enforce St. Louis Code of Ords. 15.52.010 and 17.16.275 in a way that a person of ordinary intelligence could understand and comply with.

376.    St. Louis Code of Ords. 15.52.010 and 17.16.275, and the City of St. Louis' policies and customs related to their enforcement, permit arbitrary enforcement at the unbridled discretion of an

individual police officer(s), without adequate notice or an adequate opportunity to comply, in a way that does not provide a person of ordinary intelligence with a reasonable opportunity to understand what conduct is permitted and prohibited, and in a way that authorizes and encourages discrimination based on the content of the message of a person engaged in expressive activity.

374.    Moreover, the City of St. Louis has enacted and follow a custom or procedure of refusing to negotiate or dismiss any charges under these ordinances without a release of liability, which encourages its officers to act with impunity and in violation of the civil rights of their citizens.

**WHEREFORE**, Plaintiffs pray for judgment in favor of Plaintiffs against all Defendants for compensatory damages, punitive damages (against individual Defendants only), attorneys' fees, expenses, costs, declare St. Louis Code of Ords. 15.52.010 and 17.16.275 unconstitutional, and for any other relief this Court deems just and appropriate.

Date:   October 14, 2022                          Respectfully submitted,

**KHAZAELI WYRSCH LLC**                  **CAMPBELL LAW LLC**

/s/ Javad M. Khazaeli                          /s/ Alicia Campbell
Javad M. Khazaeli, 53735MO                Alicia Campbell, 59586MO
James R. Wyrsch, 53197MO                 John Campbell, 59318MO
911 Washington Avenue, Suite 211         3470 S. Jefferson
St. Louis, MO 63101                          St. Louis, Missouri 63114
(314) 288-0777                               alicia@campbelllawllc.com
(314) 400-7701 (fax)                         john@campbelllawllc.com
james.wyrsch@kwlawstl.com
javad.khazaeli@kwlawstl.com

*Attorneys for Plaintiffs*